**UNITED STATES of America Appellee,**

v.

**Prince GAINES, Defendant–Appellant.**

**Docket No. 04–5616–CR.**

United States Court of Appeals, Second Circuit.

Argued: July 5, 2005.

Decided: July 20, 2006.

Michael Farbiarz, Assistant United States Attorney for the Southern District of New York (Karl Metzner, Assistant United States Attorney, Of Counsel; David N. Kelly, United States Attorney, on the brief), New York, NY, for Appellee.

Darrell B. Fields, Federal Defenders of New York, Inc., Appeals Bureau, New York, NY, for Defendant–Appellant.

Before: JACOBS, B.D. PARKER, Circuit Judges, and GLEESON, District Judge.[1]

GLEESON, District Judge.

Prince Gaines appeals from a judgment of the United States District Court for the Southern District of New York convicting him of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g), and sentencing him principally to a 92–month term of imprisonment. On appeal, Gaines argues, *inter alia*, that the district court erred by (1) denying his motion to suppress evidence; and (2) instructing the jury that his interest in the case "create[d] a motive for false testimony," that he had a "deep personal interest" in the outcome of the trial, and that his testimony should be carefully scrutinized.

The judgment of conviction is vacated, and the case is remanded for further proceedings. The record is insufficiently developed to permit appellate review of the district court's order denying the motion to suppress. As for the challenged jury instructions, we find error in the instruction that the defendant's interest in the outcome of the case created a motive to testify falsely, and we prohibit the use of such instructions in future trials. We also express our disapproval of instructions that highlight a testifying defendant's deep personal interest in the outcome of a trial. We recommend that a witness's interest in the outcome of the case be addressed in the court's general charge concerning witness credibility; if the defendant has testified, the trial court should tell the jury to evaluate the defendant's testimony in the same way it judges the testimony of other witnesses.

## FACTS

Prince Gaines was picked up by a livery cab at the corner of 167th Street and Findlay Avenue in the Bronx at approximately 11:30 p.m. on January 28, 2004. Almost immediately, the cab, which was owned and operated by Raul Juarez, was pulled over by Sergeant Ralph Cilento and Officer Ronald Schudde. Cilento approached the driver's side of the cab. He opened the rear door, told Gaines to get out, and examined the rear of the cab. He found an inexpensive, inoperable, small-caliber handgun wedged in the space between the seat cushion and the seat back. Gaines was thereupon arrested. Because he was a convicted felon, he was charged with violating 18 U.S.C. § 922(g).

### A. *The Suppression Hearing on the Morning of Trial*

The case was scheduled for trial on Monday, May 10, 2004. In a letter sent by facsimile the evening before, Gaines's lawyer moved to suppress the gun seized from

the livery cab. The following morning, he explained why the motion came so late. Whereas the complaint filed on the day of the arrest had justified the stop of the cab by recounting the officers' alleged observation that it lacked a safety partition,[2] a police report that was disclosed on the eve of trial suggested a different reason: that the cab bore a sticker inviting safety checks by the police. Defense counsel also learned the day before trial that Sergeant Cilento had previously stopped Gaines for marijuana possession. Based on these newly-disclosed facts, together with the undisputed fact that the cab had no safety check sticker, Gaines moved to suppress on the ground that the police had illegally stopped the cab. Specifically, he contended that the cab was stopped not because of an observed traffic infraction, but because the officers had just seen Gaines get into it, and they had an interest in him.

After expressing her annoyance at the United States Attorney's office-wide policy regarding the timing of its disclosure of witness statements governed by 18 U.S.C. § 3500, and her resentment that a suppression hearing was made necessary by that policy even as a jury panel was waiting, the district judge reluctantly determined to "have the most narrow, narrow suppression hearing right now."

Cilento testified that he and Schudde were in their patrol car directly behind the cab. Both cars were on the south side of the street. The cab had tinted windows, and it was almost midnight. Cilento pulled the cab over because he saw it had no safety partition between the front and back seats. He acknowledged the particular difficulty of seeing inside a car with

tinted windows late at night, but nonetheless insisted that he observed the absence of a partition. Cilento admitted that the cab was equipped with a security camera and had a window sticker so indicating, which meant it was not required to have a partition. But he claimed not to have seen the window sticker before making the stop.[3] He denied the defense allegation that he had stopped the cab because he had an interest in Gaines, asserting that he had "just caught a little glimpse of the person getting in" the cab, and did not know at the time who he was.

The defense called Detective Luke Waters, the case agent, who also testified, among other things, that the cab had tinted windows.

The district court denied the motion to suppress, stating as follows:

> I appreciate the argument that tinted windows and nighttime do make it more difficult to see, but the witness said he did see, and there hasn't been any reason offered as to why at the time he was not operating for the reasons that he stated he was.
>
> So under the circumstances, while as I say I appreciate that it is obviously more difficult to see through tinted windows and more difficult to see at night than during the day, I found [Cilento's] manner to be credible, and in the absence of some motive for him to have made this stop that was inappropriate, I am going to deny the suppression motion.

The court then proceeded to select a jury.

### B. *The Trial Testimony*

At trial, Cilento again testified that the livery cab was stopped because he ob-

---

**2.** Livery cabs must have such a partition unless they are equipped with an alternate safety device, *see* N.Y. Comp.Codes R. & Regs., tit. 35, § 6–13(a)(2003), such as an in-vehicle safety camera.

**3.** Cilento also asserted yet another reason for the stop: that Gaines was picked up as a street hail, which livery cabs are not permitted to do.

served that there was no partition and because the cab had picked up a street hail. He added that while he was still in the police car, he observed through the tinted rear window that the passenger in the rear of the cab "got up on his knee, turned to the side and sat back down quickly."

When Cilento opened the rear door of the cab, Gaines engaged him in some "quick banter" about things of no importance and appeared nervous. This aroused Cilento's suspicion. Gaines was instructed to get out of the cab, and he complied. In the rear seat was a black plastic bag containing some personal items. Also, upon shining his flashlight into the back seat, Cilento observed a chrome object wedged into the "crevice" in the back seat, where the back rest meets the seat itself. It looked to Cilento like it could have been the chrome part of a seatbelt buckle. When he moved closer he saw it was the bottom of an upside-down handgun that had been wedged down into the crack of the seat.

Cilento then arrested Gaines. As the handcuffs were being placed on him, Gaines said "What are you doing? That's not mine."

Juarez, the driver of the cab, testified that the customer before Gaines had inspected the back seat for 30 to 40 seconds, finding nothing. Juarez further testified that he instructs all of his passengers to do that at the end of their rides. In direct contradiction of the arresting officers, Juarez testified that his cab did not have tinted windows.

Gaines testified in his own defense, stating that after he was ordered out of the back of the cab, he heard the officers say they had found a gun. He denied that it was his or that he had been aware of its presence. According to Gaines, the police told him, "We found a gun. It's yours."

On the way to the precinct, they told him he would face eight years in jail and asked whether he wanted to cooperate.

## C. The Jury Charge

The district court's jury charge included an interested-witness instruction pertaining to Gaines's testimony. The charge read as follows:

> The defendant in a criminal case never has any duty to testify or come forward with any evidence. This is because, as I've told you, the burden of proof beyond a reasonable doubt remains on the government at all times, and Mr. Gaines is presumed innocent.
>
> In this case Mr. Gaines did testify and he was subject to cross-examination like any other witness. Obviously, the defendant has a deep personal interest in the result of his prosecution. This interest creates a motive for false testimony and, therefore, the defendants' testimony should be scrutinized and weighed with care. You should examine and evaluate his testimony just as you would the testimony of any witness with an interest in the outcome of this case. In appraising the defendant's credibility you may take that into account.
>
> It by no means follows, however, that simply because a person has a vital interest in the end result he is not capable of telling a truthful and straightforward story. It is for you to decide to what extent, if at all, the defendant's interest has affected or colored his testimony.

Defense counsel objected, arguing that the charge implied that Gaines's testimony was false, or at least less credible than the testimony of the other witnesses. Counsel specifically objected to the statements that the defendant had a motive to testify falsely and that his testimony should be scrutinized with care.

## DISCUSSION

### A. *The Search of the Livery Cab*

Gaines, appeals the district court's denial of his motion to suppress the gun seized from the back of the cab. He argues that the police officers did not have a lawful basis to stop the cab.

 In order to stop a car, the police must have either "probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct." *United States v. Scopo*, 19 F.3d 777, 781–82 (2d Cir.1994) (internal quotation marks omitted). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). Thus, if Sergeant Cilento and Officer Schudde observed a traffic offense committed by the driver of the cab, the stop was reasonable. And if the stop was reasonable, Cilento was authorized to order Gaines to get out of the cab. *See Maryland v. Wilson*, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). Finally, if a weapon was in plain view once Gaines was out of the cab, the entry into the back of the cab to extract it from between the seat cushions was permissible. *Scopo*, 19 F.3d at 782.

The government argues that Cilento's observation that the cab lacked the required safety partition justified the stop. Gaines contends that Cilento "straight out lied" about why he stopped the cab, and that the government failed to prove a justification for the stop.

 We review a district court's findings of fact for clear error. *United States v. Mendez*, 315 F.3d 132, 135 (2d Cir.2002) (citing *United States v. Eng*, 997 F.2d 987, 990 (2d Cir.1993)). Particularly strong deference is given to factual findings that are based on credibility determinations by the court. *Id.* Although this case may eventually test the limits of that deference, the current record is insufficiently developed to permit appellate review of the district court's denial of the motion to suppress. For the reasons set forth below, we find it appropriate to vacate the order denying the motion to suppress and to remand to the district court for a new hearing on the motion.

The first and most obvious problem with the government's case at the suppression hearing was Cilento's claim that he could actually observe, at night and through tinted windows, the *absence* of a partition in the cab. Recognizing the implausibility of that testimony, and the fact that the cab's owner testified that it did *not* have tinted windows, the government argues on appeal that, "[a]s the District Court found ... Cilento may have been mistaken about the tinting of the windows ...." But the district court found no such thing. Indeed, it found the opposite, that is, it believed Cilento's testimony that he could see into the cab *despite* the tinted windows and the darkness.

Of course, if the district's court's implicit finding that the car had tinted windows is clearly erroneous, that means it was more likely that Cilento could have observed the absence of a partition. On the other hand, if Cilento's testimony about the tinted windows is rejected, it could undermine the credibility of his other observations and testimony.

Tinted windows or not, even if Cilento saw that the cab had no partition, the stop was lawful only as long as he did *not* see the sticker on the window of the passenger-side rear door indicating that the cab was equipped with a security camera. Because such a camera is an approved safety device that may be employed in lieu of a

partition, its undisputed presence in the cab vitiated the government's asserted basis for the stop. The district court found that Cilento did not observe the sticker, but, as discussed above, the district court may choose to revisit that finding on remand.

Moreover, Cilento testified at the suppression hearing that another reason he stopped the cab was that it had picked up Gaines as a street hail, which livery cabs are not permitted to do. The district court made no finding with respect to this alternate justification for the stop.

Finally, the district court made no finding with regard to whether the seized firearm was in plain view. Cilento testified at trial that he observed a chrome object that looked like a seat belt buckle in the seam between the seat cushion and the seat back in the rear of the cab. A seat belt spotted on an empty seat would not be a basis for a search. Though Cilento said a "closer look" revealed it to be a handgun, it is not clear from his testimony whether that closer look occurred only after he reached his hand into the crevice and removed the weapon.

We recognize that the district court's insufficient fact findings may be the result of the procedural irregularity of the eleventh-hour motion to suppress. There were no formal motion papers, before or after the hearing, setting forth each side's factual and legal contentions. Rather, the motion was made literally as the trial was to begin, and was decided immediately after a brief hearing and a couple of minutes of oral argument.

In light of the anomalous and incomplete findings, we vacate the order denying the motion to suppress and remand the case to the district court for further proceedings, including a new evidentiary hearing, on the motion. *See United States v. Matsushita,* 794 F.2d 46, 49 (2d Cir.1986) (remanding for clarified and more explicit findings with respect to motion to suppress evidence).

**B.** *The Jury Charge*

■ Gaines argues that the district court's jury instructions regarding the evaluation of his testimony deprived him of a fair trial. Specifically, Gaines challenges the following instruction: "Obviously, the defendant has a deep personal interest in the result of his prosecution. This interest creates a motive for false testimony and, therefore, the defendant's testimony should be scrutinized and weighed with care." This language unfairly disparaged his credibility, Gaines argues, and did so in a close case that hinged directly on the jury's credibility determinations.

■ In deciding such a claim, our review is *de novo;* we reverse "only if the charge, taken as a whole, was prejudicial." *United States v. Caban,* 173 F.3d 89, 93 (2d Cir.1999). We conclude that the charge in this case prejudiced Gaines, and that a new trial is required.

At the outset, two propositions are clear. First, a testifying defendant in a criminal trial has a personal interest in its outcome that is as deep as it is obvious. Second, by testifying, the defendant places his credibility directly in issue, and his interest in the outcome may properly be considered by the jury in determining how much, if any, of his testimony to believe. Beyond those indisputable propositions lies more than a century of litigation over what a trial judge may properly say to a jury about a testifying defendant's credibility.

The Supreme Court stated in *Reagan v. United States,* 157 U.S. 301, 305, 15 S.Ct. 610, 39 L.Ed. 709 (1895), that the fact that a witness is the defendant "creates an interest greater than that of any other witness, and to that extent affects the question of credibility. It is therefore a

matter properly to be suggested by the court to the jury." However, in both *Reagan* and *Hicks v. United States,* 150 U.S. 442, 14 S.Ct. 144, 37 L.Ed. 1137 (1893), the Court identified a limit on what else a trial court could tell the jury about the defendant's interest in the outcome. In *Hicks,* the jury instructions included, *inter alia,* the following admonitions about the defendant's testimony:

> He is in an attitude, of course, where any of us, if so situated, would have a large interest in the result of the case; the largest perhaps, we could have under any circumstances in life; and such an interest, consequently, as might cause us to make statements to influence a jury in passing upon our case that would not be governed by the truth. We might be led away from the truth because of our desire.

150 U.S. at 451, 14 S.Ct. 144. In other words, the jury was told that the defendant's "large" interest in the outcome of the case gave him a motive to lie.

In reversing the conviction, the Supreme Court held that trial judges should not "intimate" that the defendant's interest in the outcome of the trial "deprive[s] his testimony of probability":

> [I]t must be remembered that men may testify truthfully, although their lives hang in the balance, and the law, in its wisdom, has provided that the accused shall have the right to testify in his own behalf. Such a privilege would be a vain one if the judge, to whose lightest word the jury, properly enough, give a great weight, should intimate that the dreadful condition in which the accused finds himself should deprive his testimony of probability.

*Id.* at 452, 14 S.Ct. 144. Two years after *Hicks,* in *Reagan,* the Court reiterated both the general rule, *i.e.,* that the trial court may instruct the jury that the defen-

dant has a "deep personal interest" that may be considered by the jury, and the caveat that there be no "declaration nor intimation that the defendant has been untruthful in his testimony." 157 U.S. at 311, 15 S.Ct. 610.

Both *Hicks* and *Reagan* addressed this issue in the context of a defendant's right to testify, which at the time was a statutory right of relatively recent vintage. *See Reagan,* 157 U.S. at 304, 15 S.Ct. 610 (citing predecessor to 18 U.S.C. § 3481). More recently, courts have evaluated challenges to such instructions against the backdrop of the presumption of innocence. *See, e.g., United States v. Vega,* 589 F.2d 1147, 1155 (2d Cir.1978) (Gurfein, J., concurring) (a "heavily weighted" instruction about the defendant's self-interest "makes the choice of the defendant to testify ... the basis for inferentially downgrading the presumption of innocence"); *United States v. Rollins,* 784 F.2d 35, 37 (1st Cir.1986) ("Since [*Reagan* ], the lower courts have been increasingly troubled with the seeming psychological inconsistence of charging in one breath that a defendant is presumed to be innocent, and in the next that his, or her, testimony is peculiarly suspect.").

■■ The "presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States,* 156 U.S. 432, 453, 15 S.Ct. 394, 39 L.Ed. 481 (1895). "To implement the presumption, courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established ... beyond a reasonable doubt." *Estelle v. Williams,* 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). Accordingly, this Court has placed out of bounds practices

that threaten to dilute the presumption of innocence. *See, e.g., United States v. Oshatz,* 912 F.2d 534, 539 (2d Cir.1990) (even though guilt-assuming hypothetical questions, posed on cross-examination to a defendant's character witnesses, have probative value in assessing the credibility of the witness, they are "nevertheless to be prohibited because [they] create[ ] too great a risk of impairing the presumption of innocence").

Particularly instructive to the case at hand is *United States v. Dove,* 916 F.2d 41 (2d Cir.1990), which involved the trial court's jury charge. The challenged instruction was a hypothetical inquiry into "whether Jack shot Mary," which was intended to illustrate the concept of circumstantial evidence. *Id.,* at 44. The problem, we explained, was that the hypothetical assumed Jack's guilt. *Id.,* at 46. In reversing and remanding for a new trial, we observed that "a hypothetical that assumes guilt where defendant asserts his innocence is disfavored." *Id.*

This principle leads us to denounce any instruction, including the one at issue here, that tells a jury that a testifying defendant's interest in the outcome of the case creates a motive to testify falsely. We do so not because the instruction is necessarily inaccurate, either generally or as applied to Gaines. To the contrary, we think it clear that defendants frequently have a motive to lie. Indeed, in a perfect world, where prosecutors charged only the guilty, defendants would *always* have a motive to testify falsely. But an instruction that the defendant has a motive to testify falsely undermines the presumption of innocence. In this regard, there is an important distinction between a "motive to lie" instruction and an instruction that a defendant has a deep personal interest in the case. A defendant has a deep personal interest in the outcome of a trial whether or not he

is guilty. Thus, the instruction, though unnecessary and potentially prejudicial, as we discuss further below, is at least always true. But a defendant does not always have a motive to testify falsely. An innocent defendant has a motive to testify truthfully. As the government candidly acknowledged at oral argument, the district court's charge that Gaines's "interest create[d] a motive for false testimony" was true only if Gaines was, in fact, guilty.

Indeed, the instruction challenged here poses an even greater threat of undermining the presumption of innocence than the instruction in *Dove,* as it assumed the guilt not of a hypothetical "Jack," but of Gaines himself. Gaines was presumed innocent, and that presumption accompanied him to the witness stand. We do not mean that a defendant who is presumed innocent should also be presumed to testify truthfully. Neither does the Supreme Court, which has made it clear that a defendant's credibility should be subject to the same scrutiny as the testimony of other witnesses. *See Portuondo v. Agard,* 529 U.S. 61, 73, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000). We do believe, however, and hold, that the trial court's jury instructions about a defendant's testimony must not assume that he is guilty.

We recognize that our precedents in this area include cases that find no error in similar jury instructions so long as the "motive to lie" charge is "balanced" by a further instruction that the motive does not preclude the defendant from telling the truth. *See, e.g., United States v. Gleason,* 616 F.2d 2, 15–16 (2d Cir.1979) (charge that defendant's interest "creates, at least potentially, a motive for false testimony" was sufficiently balanced by further charge that "it by no means follows that … he is not capable of telling a truthful, candid, and straight-forward story") (internal quo-

tation marks omitted).[4] The rule has not been easy to administer. For example, the absence of such balancing language resulted in reversal in *United States v. Matias*, 836 F.2d 744, 749–50 (2d Cir.1988) (admonition to "consider" defendant's testimony was insufficient to balance motive to lie instruction), but not in *United States v. Floyd*, 555 F.2d 45, 47 and n. 4 (2d Cir.1977) (admonition that "you must decide whether to believe him" was "adequate," though explicit statement that motive to lie is not inconsistent with the ability to render truthful testimony is "preferable"), or *United States v. Schlesinger*, 598 F.2d 722, 727 (2d Cir.1979) (failure to include balancing language not error).

We find this approach unsatisfactory for a reason that transcends its difficulty of administration. The critical defect in a jury instruction that says the defendant has a motive to lie is its assumption that the defendant is guilty. That defect is not cured by a further charge that a defendant can still be truthful. Rather, the two instructions can act in synergy; as Judge Gurfein observed in *Vega*, George Washington is said to have admitted to chopping down the cherry tree. 589 F.2d at 1155 (Gurfein, J., concurring). And indeed, in the courtroom, the practical effect of the "balancing" language our cases have endorsed is a message more akin to "even guilty people can occasionally admit it" than to "even defendants may truthfully deny the accusations." In any event, we conclude that it is far better for a trial judge's instructions not to assume the defendant's guilt at all than to assume his guilt and then attempt to mitigate the damage by saying he is nevertheless capable of telling the truth. Accordingly, to prevent a needless threat of dilution of the presumption of innocence, we hereby direct district courts in the circuit not to charge juries that a testifying defendant's interest in the outcome of the case creates a motive to testify falsely.

We also have concerns with the district court's charge that Gaines had a "deep personal interest" in the outcome of the trial. Arguably, the juxtaposition of that instruction with the further admonition that Gaines's testimony should "therefore ... be scrutinized and weighed with care" constitutes the sort of "intimation" that the defendant has been untruthful that *Hicks* and *Reagan* prohibit. We need not decide that question today, as the combination of those instructions with the motive to lie charge discussed above warrants the vacatur of Gaines's conviction. Nevertheless, we join those courts that have expressed disapproval of a jury instruction highlighting a testifying defendant's deep personal interest in the outcome of a trial. Among the first was the Eighth Circuit in *Taylor v. United States*, 390 F.2d 278 (1968), which involved an instruction reminding the jury of "the very grave interest" the testifying defendant had in the case. *Id.* at 284. Citing *Reagan*, among other cases, then-Circuit Judge Harry Blackmun rejected the challenge, but observed that the continuing and frequent complaints about such instructions warranted their elimination. A defendant's credibility is better addressed "by reference in the court's general instructions as to all witnesses. We would prefer that the defendant not be singled out. His interest is obvious to the jury." *Id.* at 285. Two years later, the First Circuit agreed with

---

4. *See also, e.g., United States v. Martin*, 525 F.2d 703, 706 and n. 3 (2d Cir.1975) (no plain error where "motive for false testimony" charge balanced by "however, it by no means follows that ... [the defendant] is not capable of telling a truthful and straightforward story"); *United States v. Tolkow*, 532 F.2d 853, 859 and n. 3 (2d Cir.1976) (upholding charge substantially identical to that in *Martin*).

*Taylor.* Rejecting, on plain error review, a challenge to a charge that the defendant's interest is usually greater than that of any other witness, the court nevertheless endorsed *Taylor's* suggestion that the defendant's interest be referenced by a simple addition to the court's general instructions about witness credibility. *Carrigan v. United States,* 405 F.2d 1197, 1198 (1st Cir.1969) (per curiam).

As for this Court, our opinions policing charges about a testifying defendant's interest in the outcome of the trial are replete with misgivings about the need for them. *See, e.g., Schlesinger,* 598 F.2d at 727 ("While we do not retreat from [the view that a defendant's 'vital interest' charge requires balancing language, we] question the need for any instruction as to the effect the defendant's interest may have on his credibility...."). Indeed, we have expressly disapproved a jury charge stating that the defendant's interest is "of a character possessed by no other witness," albeit in the context of a charge infused with multiple other errors. *United States v. Assi,* 748 F.2d 62, 68 (2d Cir.1984) (internal quotation marks omitted) (citing *United States v. Araujo,* 539 F.2d 287, 289–90 (2d Cir.1976)).

Nothing could be more obvious, and less in need of mention to a jury, than the defendant's profound interest in the verdict. Is there harm in stating the obvious? Perhaps so; as the First Circuit has observed, when the trial court mentions a defendant's "great personal interest," "[a] jury might well think that the court had a purpose in stating the obvious ..., a purpose unfavorable to the defendant." *United States v. Dwyer,* 843 F.2d 60, 63 (1st Cir.1988). In the absence of a need to give such an instruction, and we perceive none, the risk of unfairly denigrating the defendant's testimony should not be incurred.

All of the pattern jury instructions of the circuits that have them eliminate these concerns by adopting *Taylor's* suggestion. The First and the Eleventh Circuits' general credibility charges include, as one of several factors to consider, the witness's interest in the outcome of the case, and include no specific charge for a defendant's testimony.[5] The Fifth, Sixth, Seventh, Eighth and Ninth Circuits' general credibility charges do the same thing, and in the event the defendant testifies, they add a statement that his credibility is to be evaluated in the same way as that of any other witness.[6] No further instruction is necessary. The relevant instruction in

---

5. First Circuit Pattern Criminal Jury Instructions Drafting Committee, *Pattern Criminal Jury Instructions for the District Courts of the First Circuit:* § 3.06 (1998) ("You may want to take into consideration such factors as ... any interest you may discern they may have in the outcome of the case ..."); Eleventh Circuit District Judges Association Pattern Jury Instructions Committee, *Pattern Jury Instructions, Criminal Cases:* § 5 (2003) ("In deciding whether you believe or do not believe any witness I suggest that you ask yourself a few questions: ... Did the witness have any particular reason not to tell the truth? Did the witness have a personal interest in the outcome of the case? ...").

6. Fifth Circuit District Judges Association Pattern Jury Instructions Committee, *Pattern*

*Jury Instructions, Criminal Cases:* § 1.08 (2001) ("The testimony of the defendant should be weighed and his credibility evaluated in the same way as that of any other witness."); Sixth Circuit District Judges Association Pattern Criminal Jury Instructions Committee, *Pattern Criminal Jury Instructions:* §§ 1.07, 7.02B (2005) ("(1) You have heard the defendant testify. Earlier, I talked to you about the 'credibility' or the 'believability' of the witnesses. And I suggested some things for you to consider in evaluating each witness's testimony. (2) You should consider those same things in evaluating the defendant's testimony."); Committee on Federal Criminal Jury Instructions for the Seventh Circuit, *Pattern Criminal Federal Jury Instructions for the Seventh Circuit,* § 1.03 (1998) ("You should judge the defendant's testimony

*Modern Federal Jury Instructions* makes no mention of a deep personal interest or a motive to lie; it simply instructs the jury to "evaluate [the defendant's testimony] just as you would the testimony of any witness with an interest in the outcome of this case." Leonard B. Sand, *et al., Modern Federal Jury Instructions,* Inst. 7–4 (2005); *see also* Kevin F. O'Malley, *et al., Federal Jury Practice and Instructions,* § 15.12 ("You should judge the testimony of [the defendant] in the same manner as you judge the testimony of any other witness in this case.")

■ In sum, in future cases, district courts should not instruct juries to the effect that a testifying defendant has a deep personal interest in the case. Rather, a witness's interest in the outcome of

the case ought to be addressed in the court's general charge concerning witness credibility.[7] If the defendant has testified, that charge can easily be modified to tell the jury to evaluate the defendant's testimony in the same way it judges the testimony of other witnesses. Though we do not purport to micromanage such charges, the Seventh Circuit's pattern instruction is set forth in the margin as an example.[8] If for some reason an additional free-standing charge on the defendant's testimony is deemed appropriate, we suggest as an example the one given in this case—stripped of the language we find to have prejudiced Gaines.[9]

\* \* \* \* \* \*

Applying the foregoing principles to this case, we find error in the challenged in-

7. In this regard, we disagree with the government's assertion that "Gaines was the only interested trial witness, and so he was the only witness as to whom an interested witness charge was appropriate." Though it may pale in degree when compared to a defendant's, arresting officers have an indisputable interest in the outcome of cases they testify in. Anyone who believes otherwise does not understand modern law enforcement. For this and other reasons, the interest-in-the-outcome factor should always be part of the general charge on credibility. It will almost always be relevant to some degree, and will do no harm even if it is not.

in the same way that you judge the testimony of any other witness."); Eighth Circuit Committee on Model Criminal Jury Instructions, *Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit:* § 3.04 (2000) ("You should judge the testimony of the defendant in the same manner as you judge the testimony of any other witness."); Ninth Circuit Committee on Model Criminal Jury Instructions, Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit: §§ 3.4, 3.9 (2003) ("The defendant has testified. You should treat this testimony just as you would the testimony of any other witness.")

8. **1.03 TESTIMONY OF WITNESSES (DECIDING WHAT TO BELIEVE)**

You are to decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all, as well as what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, you may consider, among other things:

 . . .
 — the witness's intelligence;
 — the ability and opportunity the witness had to see, hear, or know the things that the witness testified about;
 — the witness's memory;
 — any interest, bias, or prejudice the witness may have;
 — the manner of the witness while testifying; and
 — the reasonableness of the witness's testimony in light of all the evidence in the case.

[You should judge the defendant's testimony in the same way that you judge the testimony of any other witness.]

9. Such a charge would read as follows:

The defendant in a criminal case never has any duty to testify or come forward with any evidence. This is because, as I have told you, the burden of proof beyond a reasonable doubt remains on the government at all times, and [the defendant] is presumed innocent. In this case, [the defendant] did testify and he was subject to

structions regarding Gaines's testimony. As the government acknowledges, the aspect of the instruction that attributed to Gaines a "motive for false testimony" was correct only if Gaines was guilty. It therefore undermined the presumption of innocence. In combination with the directive to carefully "scrutinize[ ]" Gaines's testimony, and the unnecessary emphasis on his already-obvious self-interest, we hold that the charge viewed as a whole was so unbalanced as to amount to reversible error.[10]

The government argues that any such error was harmless because the evidence against Gaines was "overwhelming." We disagree. This was a close case. Even viewed charitably, the officers' testimony was mistaken in material respects, and even if believed, it was not inconsistent with Gaines's claim that the inoperable weapon hidden in the crevice of the cab's back seat was not his. The trial boiled down to the credibility of Gaines's testimony, and thus the erroneous instructions cannot reasonably be considered harmless.[11]

---

cross-examination like any other witness. You should examine and evaluate the testimony just as you would the testimony of any witness with an interest in the outcome of the case.

10. The government argues that this Court has "consistently approved interested-witness charges such as" the one in this case. But all of the cases it relies on are distinguishable. This case involves (1) a preserved challenge to a charge that (2) the defendant has a deep personal interest giving rise to (3) a motive to lie and a resulting need to (4) carefully scrutinize the defendant's testimony. At least one of those factors is absent in every case the government cites. *See United States v. Mahler*, 363 F.2d 673, 678 (2d Cir.1966) (no objection; no motive to lie instruction); *Martin*, 525 F.2d at 706 (no objection; no careful scrutiny instruction); *Tolkow*, 532 F.2d at 859 n. 3 (no careful scrutiny instruction); *Floyd*, 555 F.2d at 47 (no careful scrutiny instruc-

## CONCLUSION

For the foregoing reasons, the judgment of conviction is vacated and the case is remanded for further proceedings consistent with this opinion. Specifically, Gaines shall be afforded a new evidentiary hearing on his motion to suppress evidence. In the event the motion is denied once again, he shall be entitled to a new trial.

---

tion); *United States v. Rucker*, 586 F.2d 899, 904 (2d Cir.1978) (no objection); *United States v. Hernandez*, 588 F.2d 346, 349–50 (2d Cir.1978) (no objection); *Vega*, 589 F.2d at 1154 (no objection); *Gleason*, 616 F.2d at 15 (instruction that interest "creates, *at least potentially*, a motive for false testimony" does not assume guilt) (emphasis added) (internal quotation marks omitted).

11. Our decision has no bearing on jury instructions related to the testimony of informants and accomplices, which raise related but distinct issues. Unlike defendants, such witnesses are not presumed innocent, and the nature of their interest in the outcome (which can depend on, *e.g.*, their agreement, if any, with the government; the terms of an immunity order; and whether they are called by the prosecutor or the defendant) is often not obvious at all. This case does not implicate such instructions, and we therefore express no view on them.