06-2710-cr
*United States v. Brutus*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2006

(Argued: February 14, 2007      Decided: October 2, 2007)

Docket No. 06-2710-cr

------------------------------------------------------------x

UNITED STATES OF AMERICA,

             Appellee,

                         -- v. --

WALINE BRUTUS,

             Defendant-Appellant.

------------------------------------------------------------x

B e f o r e :  Jacobs, <u>Chief Judge</u>, Walker and Calabresi, <u>Circuit Judges</u>.

     Appeal from a judgment of the United States District Court for the Eastern District of New York (I. Leo Glasser, <u>Judge</u>) convicting appellant, after a jury trial, of importing five or more kilograms of cocaine, in violation of 21 U.S.C. § 952, and possessing five or more kilograms of cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a).

AFFIRMED.

                              DAVID A. LEWIS, Federal Defenders
                              of New York, Inc., Appeals Bureau,
                              New York, NY, <u>for
                              defendant-appellant</u>.

ANTHONY G. KYRIAKAKIS, Assistant United States Attorney (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Susan Corkery, Assistant United States Attorney, on the brief), New York, NY, for appellee.

JOHN M. WALKER, JR., Circuit Judge:

Defendant-appellant Waline Brutus appeals from a judgment of the District Court for the Eastern District of New York (I. Leo Glasser, Judge) convicting her, after a jury trial, of importing five or more kilograms of cocaine, in violation of 21 U.S.C. § 952, and possessing five or more kilograms of cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a). Brutus, who testified on her own behalf at trial, contends on appeal that the district court erred in instructing the jury on how to evaluate her testimony. For the reasons that follow, we agree; however, we further conclude that the error was harmless beyond a reasonable doubt and therefore affirm Brutus' convictions.

**BACKGROUND**

**I.   The Government's Case**

At trial, the government elicited testimony to the following effect. On August 27, 2005, Brutus arrived at JFK International Airport on a flight from Haiti. While waiting in the baggage area, she was approached by Officer Maria Morelli, a member of

2

the airport's Passenger Enforcement Roving Team.  In response to questioning by Officer Morelli, Brutus confirmed that everything in her possession, including her suitcase, was her own.  After moving Brutus to a secondary inspection area, Officer Morelli inspected Brutus' suitcase.  There, she found twelve men's sandals[1] packed between various articles of clothing.  Noticing that the sandals were unusual in weight and size, the officer probed one of them.  Inside it she found a white, powdery substance that field tested positive for cocaine.

After escorting Brutus to a private search room, Officer Morelli arrested Brutus and contacted agents from Immigration and Customs Enforcement.  Senior Special Agent Amanda Jackson and Special Agents Sean Garvey and Timothy Varian responded.  Agent Garvey conferred with Officer Morelli and then identified himself to Brutus and asked her if she spoke English, to which she replied affirmatively.  Brutus was then informed of her Miranda rights, which she waived.

During a fifteen minute initial interview, Brutus admitted that she knew drugs were hidden within the sandals, though she was not aware of the kind of drugs.  She further explained that she was recruited to be a drug courier by a friend of hers named Marjorie; that she was to be paid $3,000 for her efforts; and that someone whom she did not know was supposed to meet her in

---

[1]     While there were twelve sandals total, ranging from size 10 to 13, there were only five pairs; two sandals did not match.

the airport lobby to take possession of the drugs. Agent Garvey then asked Brutus if she would participate in a "controlled delivery" of the drugs. She agreed.

Once surveillance was in place, Brutus was instructed to walk into the airport lobby area and wait until she was approached by the pick-up person. Brutus did as she was instructed, but after a wait of 45 minutes, the agents abandoned the controlled delivery and brought Brutus back to the search room for further questioning.

Agents Garvey and Varian conducted the second interview, which lasted approximately 45 minutes to an hour, after reminding Brutus of her Miranda rights. She agreed to answer more questions and proceeded to provide additional details about her involvement in drug smuggling. She stated that she first met Marjorie while working with her at a Days Inn in Miami, Florida, and that she believed Marjorie now lived in New York or New Jersey. She further explained that she agreed to smuggle the drugs because she needed the money to pay her rent. Agents later found three notice slips in her suitcase indicating that $190 in rent and $65 in late payment penalties were overdue. The building address on the notices matched the address Brutus listed on her customs declaration form.

Brutus stated that she originally was supposed to fly into Miami but, on the day before her return trip, a male friend of

4

Marjorie's instructed Brutus to change her flight destination to New York. The same man gave Brutus the drugs at the airport in Haiti on the day she left for New York. Brutus also informed the agents that Marjorie had instructed her that, if no one met her in the airport lobby, she was to call Majorie in Haiti for alternative delivery instructions. She then provided the agents with the telephone number and expressed her willingness to participate in a recorded call with Marjorie. She noted, however, that Marjorie would expect her to speak in Creole. Without a Creole-speaking agent available to monitor the telephone call, the agents decided against placing the call.

During her second interview, Brutus also stated that she had smuggled drugs into Miami from Haiti in the fall of 2004. She said that that trip had been arranged by Marjorie and another woman named Mona. While she did not know what type of drugs she had smuggled during that trip, she knew they were concealed within wooden voodoo statues. She also explained how the delivery occurred: when she arrived in Miami, Mona's son Jason picked her up, took possession of the drugs, and two days later paid her $2,500. Brutus' account of this event included physical descriptions of Marjorie, Mona, two male individuals associated with Marjorie, and Jason. Inspection of Brutus' passport revealed that she had flown to Haiti and returned to Miami several times in the fall of 2004.

## II. The Defense's Case

Using a Haitian-Creole interpreter, Brutus took the stand in her own defense. She testified that much of what the government's witnesses said was accurate, including their account of the statements she made during her two airport interviews. She claimed, however, that certain statements — namely, her confession to the offenses of conviction and her admission to prior involvement in drug smuggling — were false.

According to Brutus, the agents initiated the first interview by asking her whether she knew her suitcase contained drugs. When she answered no, the agents asked her if she had children. She replied she had a two-month old baby and a five-year old. The agents responded, Brutus explained, by telling her that she would remain in prison for ten years if she refused to admit she knew of the drugs. Scared of this fate, Brutus told the jury, she falsely confessed.

Brutus also explained the statements she made during the second airport interview. She stated that one of the agents told her that he would help her plight if she said yes to the questions asked. She added that the agents were "so kind" to her when she admitted knowing about the drugs but were not kind when she denied it. This, according to Brutus, caused her to lie about the current smuggling trip and to falsely state that she had also smuggled drugs in the fall of 2004.

The truth, Brutus testified, was quite different. In contrast to the incriminating story she told during her two airport interviews, Brutus provided the following explanation for her trips to Haiti in the fall of 2004 and August 2005.

Brutus testified that she came to the United States from Haiti in 2000 and that, just prior to her arrest, she lived in Miami with her brother and two children. During 2004, she traveled to Haiti several times to visit her ailing father and, ultimately, to attend his funeral. It was during one of these trips, recounted Brutus, that "Mona," a friend of Brutus' mother, asked Brutus to bring certain traditional Haitian souvenirs to Miami and sell them in a store. Per Mona's instructions, Brutus was to send the proceeds to Mona in Haiti and tender any unsold items to Mona's son, Jason. Brutus testified that she complied with Mona's instructions but denied that the items Mona gave her contained drugs.

As to the trip to Haiti in August 2005 that resulted in her arrest, Brutus testified that its purpose was to see her ill mother outside of Port-au-Prince, Haiti. The day she arrived in Port-au-Prince, Brutus stayed in a hotel where Marjorie Luc, her best friend, came to see her. Brutus discussed her future plans with Marjorie, including her plan to move with her children to New York and find employment there. Brutus also told Marjorie that she had a good friend in New York, Alina, who had offered

7

her a place to stay and help finding a job.  When Marjorie heard this, Brutus testified, Marjorie told Brutus not to fly back to Miami but, instead, to go directly to New York from Haiti. Marjorie then offered to pay for the ticket, adding that Brutus could take some sandals to a friend of Marjorie's in New York who often received sandals and similar items.  Brutus asked Marjorie whether Brutus knew the friend, and Marjorie replied that she did but, wanting it to be a "suprise," would not tell Brutus the person's name.  Brutus said she initially rejected Marjorie's proposal but, while visiting her mother the next day, gave it more thought and decided to accept.

Brutus testified that, as she had told Marjorie, she intended to stay with Alina while she took a few days to apply for jobs.  She added that she planned to leave her older child with her brother and the younger with the child's father during this time.  Brutus did not inform Alina of her plan.  Nor did she tell her brother or the father of her youngest child, stating that the child's father would not have let Brutus travel to New York if she had told him beforehand.  When asked why the father's permission would not be forthcoming, Brutus replied that she did not know.

Brutus then testified that when she returned to Port-au-Prince, she called Marjorie to accept her offer.  The next day, Brutus went to the airport where she was met by an unknown man

and Marjorie, who handed Brutus an airplane ticket[2] and gave the suitcase full of sandals to security.  Brutus stated that she had the opportunity to glance inside the suitcase when security opened it briefly, but she saw only sweatshirts.  She then gave security a plastic bag full of her own clothes to place inside the suitcase and boarded the plane, never suspecting that Marjorie would have concealed drugs within the sandals.

**III. The Jury Charge**

Over the objection of defense counsel, the district court's jury charge included an interested-witness instruction, pertaining to Brutus' testimony, as follows:

> The defendant is on trial only for the crimes charged
> in the indictment and for nothing else.  And although
> presumed innocent and because she is presumed innocent,
> a defendant is not obligated to testify on her own
> behalf.  She is not obligated to call any witnesses or
> present any evidence on her own behalf.  But a
> defendant may testify on her [own] behalf and this
> defendant did so.
>
> A defendant who does testify on her own behalf
> obviously has a deep personal interest in the outcome
> of her prosecution.  It's fair to say that the interest
> which a defendant has in the outcome of the case is an
> interest which is possessed by no other witness.  And
> such an interest creates a motive to testify falsely.
>
> And in appraising the credibility of a defendant who
> testified on her own behalf, you may take that into
> consideration.  However, and I want to say that with as
> much force as I can muster, it by no means follows
> simply because a person has a vital interest in the
> outcome of her trial that she is not capable of telling
> a truthful and straightforward story.  The defendant's

---

[2]  The record reveals that this $509.15 ticket was paid for in cash.

vital interest in the outcome of her case is not inconsistent with her ability to tell the truth. It's for you to decide what extent[,] if at all, her interest in the outcome of this trial has affected the color of her testimony.

The jury returned guilty verdicts on the two counts brought against Brutus: importing five or more kilograms of cocaine, in violation of 21 U.S.C. § 952, and possessing five or more kilograms of cocaine with the intent to distribute, in violation of 21 U.S.C. § 841(a). The district court sentenced her principally to the mandatory minimum prison term of 120 months. This appeal followed.

**DISCUSSION**

**I.   The Challenged Instruction**

Brutus argues that the district court committed reversible error in instructing the jury on how to evaluate her testimony because the instruction contains language that undermined the presumption of innocence owed to her as the accused. We generally review challenged jury instructions <u>de novo</u>, reversing only if the charge, taken as a whole, was prejudicial. <u>See</u> <u>United States v. Bok</u>, 156 F.3d 157, 160 (2d Cir. 1998).

Under our system of criminal justice, it is "axiomatic and elementary" that defendants are entitled to a presumption of innocence. Coffin v. United States, 156 U.S. 432, 453 (1895); see Estelle v. Williams, 425 U.S. 501, 503 (1976). "To implement the presumption," the Supreme Court has warned, "courts must be

10

alert to factors that may undermine the fairness of the fact-finding process." Estelle, 425 U.S. at 503. Our adherence to this admonishment has, on more than one occasion, required that we "place[] out of bounds practices that threaten to dilute the presumption of innocence." United States v. Gaines, 457 F.3d 238, 245-46 (2d Cir. 2006); see, e.g., United States v. Dove, 916 F.2d 41, 46 (2d Cir. 1990) (finding that a jury instruction's use of a hypothetical inquiry into "whether Jack shot Mary," which was intended to illustrate the concept of circumstantial evidence, was impermissible because it assumed Jack's guilt); United States v. Oshatz, 912 F.2d 534, 539 (2d Cir. 1990) (finding that while guilt-assuming hypothetical questions, posed on cross-examination to a defendant's character witnesses, have probative value in assessing the credibility of the witness, they are "prohibited because [they] create[] too great a risk of impairing the presumption of innocence").

Principally relying on Gaines, in which we discussed the presumption of innocence in the interested-witness instruction context, Brutus argues that reversible error lies in the district court's instruction that Brutus had a "deep personal interest in [the case] . . . possessed by no other witness . . ., [which] create[d] a motive to testify falsely." The government counters that reversal is precluded by United States v. Tolkow, 532 F.2d 853 (2d Cir. 1976), which found language nearly identical to that

11

challenged by Brutus to be unobjectionable.  The government adds that any untoward effect of the challenged language was adequately "balanced" by other, more favorable language.

There is tension between <u>Tolkow</u> and <u>Gaines</u>.  In <u>Gaines</u>, we reviewed an interested-witness instruction relating to the defendant's testimony that stated:

> Obviously, the defendant has a deep personal interest in the result of his prosecution.  This interest creates a motive for false testimony and, therefore, the defendants' testimony should be scrutinized and weighed with care.

<u>Gaines</u>, 457 F.3d at 242.

We criticized several aspects of this instruction.  First, we said that "an instruction that the defendant has a motive to testify falsely undermines the presumption of innocence," <u>id.</u> at 246, because it impermissibly presupposes the defendant's guilt, <u>id.</u> at 247 ("The critical defect in a jury instruction that says the defendant has a motive to lie is its assumption that the defendant is guilty.").  In order to "prevent [this] needless threat of dilution of the presumption of innocence, we . . . direct[ed] district courts in the circuit not to charge juries that a testifying defendant's interest in the outcome of the case creates a motive to testify falsely."  <u>Id.</u>[3]

Next, we were concerned about the instruction's statements

---

[3]     This opinion resolves the tension between <u>United States v. Tolkow</u>, 532 F.2d 853 (2d Cir. 1976), and <u>United States v. Gaines</u>, 457 F.3d 238 (2d Cir. 2006), the latter case having been decided after the instruction at issue in this case was delivered.

12

that the defendant had a "deep personal interest" in the outcome of the trial and that his testimony should "therefore . . . be scrutinized and weighed with care." Id. (alteration in original). We thought that such statements may, by themselves, sufficiently dilute the presumption of innocence to constitute reversible error. We did not go that far, however, and held that these statements simply added to the error already identified in the "motive to lie" instruction. Id. Nonetheless, we disapproved of jury instructions that "highlight[] a testifying defendant's deep personal interest in the outcome of a trial," id., and urged district courts to refrain from using them, see id. at 249. We concluded in Gaines "that the charge viewed as a whole was so unbalanced as to amount to reversible error." Id. at 250.

In Tolkow, by contrast, we upheld an interested-witness instruction regarding the defendant's testimony that stated:

> Obviously [the defendant] has a deep, personal interest in the result of his prosecution. Indeed, it is fair to say he has the greatest stake in its outcome. Interest creates a motive for false testimony; the greater the interest the stronger the motive, and a defendant's interest in the result of his trial is of a character possessed by no other witness.

532 F.2d at 859 n.3. (internal formatting ommitted).

Recognizing the inconsistency between our ruling in Gaines and our many decisions upholding interested-witness instructions similar to that given in Tolkow, we explained in Gaines that:

13

"This case involves (1) a preserved challenge to a charge that (2) the defendant has a deep personal interest giving rise to (3) a motive to lie and a resulting need to (4) carefully scrutinize the defendant's testimony." 457 F.3d at 250 n.10. We then distinguished the many previously approved interested-witness instructions on the basis that they lacked one of these factors[4] — specifically distinguishing Tolkow on the basis that the instruction therein did not tell the jury to "carefully scrutinize the defendant's testimony." Id.

The instruction here is, as the government contends, materially indistinguishable from the one given in Tolkow. Both instructions contain statements about the defendant's deep personal interest in the outcome of the case, which is held by no other, and that such an interest creates a motive to testify falsely; but the instructions, both in Tolkow and this case, lack a "careful scrutiny" instruction. Hence, were we to adhere to Tolkow, the government would prevail on this issue.

---

[4] See United States v. Gleason, 616 F.2d 2, 15 (2d Cir. 1979) (instruction that interest "creates, at least potentially, a motive for false testimony" does not assume guilt) (internal quotation marks omitted); United States v. Vega, 589 F.2d 1147, 1154 (2d Cir. 1978) (no objection); United States v. Hernandez, 588 F.2d 346, 349-50 (2d Cir. 1978) (no objection); United States v. Rucker, 586 F.2d 899, 904 (2d Cir. 1978) (no objection); United States v. Floyd, 555 F.2d 45, 47 (2d Cir. 1977) (no careful scrutiny instruction); United States v. Martin, 525 F.2d 703, 706 (2d Cir. 1975) (no objection; no careful scrutiny instruction); United States v. Mahler, 363 F.2d 673, 678 (2d Cir. 1966) (no objection; no motive to lie instruction).

14

The principle underlying Gaines, however, leads us to now reject the instruction we once approved in Tolkow and to overrule that holding.[5] Simply stated, an instruction that the defendant's interest in the outcome of the case creates a motive to testify falsely impermissibly undermines the presumption of innocence because it presupposes the defendant's guilt. Gaines, 457 F.3d at 246-47. This is no less true where, as here, the instruction omits additional language specifically cautioning the jury to carefully scrutinize and weigh the defendant's testimony.

We also cannot accept the government's contention that the instruction's prejudicial language was "balanced" by other, more favorable language. We made clear in Gaines that the defect in an instruction that assumes the defendant's guilt "is not cured by a further charge that a defendant can still be truthful." Id. at 247. Accordingly, with Gaines we established a prophylactic rule that it is error to instruct the jury that a defendant's interest in the outcome of the case creates a motive to testify falsely; it follows that the charge at issue here was error, the

---

[5] We also abandon our holding in Floyd to the extent that it is inconsistent with this opinion. See 555 F.2d at 47 (distinguished in Gaines as having no careful scrutiny instruction). We recognize that the law of the circuit doctrine dictates that we are "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." United States v. Wilkerson, 361 F.3d 717, 732 (2d Cir. 2004). We have therefore circulated this opinion to all active members of this court before filing. See, e.g., United States v. Gonzalez, 420 F.3d 111, 132 n.18 (2d Cir. 2005); United States v. Mincey, 380 F.3d 102, 103 n.1 (2d Cir. 2004) (per curiam).

15

prejudice from which was exacerbated by the district court's reference to the defendant's "deep personal interest." See id.

We caution our district courts that if the defendant has testified, the charge should tell the jury to evaluate the defendant's testimony in the same way it judges the testimony of other witnesses. See id. at 249. As we did in Gaines, we refer district courts to the Seventh Circuit's pattern instruction.[6]

---

[6] **1.03 TESTIMONY OF WITNESSES (DECIDING WHAT TO BELIEVE)**

You are to decide whether the testimony of each of the witnesses is truthful and accurate, in part, in whole, or not at all, as well as what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, you may consider, among other things:

. . .

- the witness's intelligence;

- the ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

- the witness's memory;

- any interest, bias, or prejudice the witness may have;

- the manner of the witness while testifying; and

- the reasonableness of the witness's testimony in light of all the evidence in the case.

[You should judge the defendant's testimony in the same way that you judge the testimony of any other witness.]

Gaines, 457 F.3d at 249 n.8 (alteration in original); see also Pattern Criminal Federal Jury Instructions for the Seventh Circuit 4 (1998), available at

Moreover, if the district court wishes to use additional charging language, we see no problem with the one given in Gaines, stripped of its prejudicial language, id. at 249 & n.9.[7]

**II.  Harmless Error**

The government argues that the foregoing error was harmless. Brutus counters that the instruction was "harmful because it put [her] at a clear disadvantage with respect to the conflicts between her testimony and that of the government's witnesses." "The crucial point in this regard," Brutus maintains, "was the contrast between [her] testimony that she had been told she could receive a ten-year sentence and be taken away from her children, which caused her to falsely confess in order to cooperate and obtain a lower sentence, and the agent's testimony that he raised these matters only after [she] confessed."

Because the district court's error affected the presumption

---

http:\\www.ca7.uscourts.gov\pjury.pdf.

[7]  This charge would read:

The defendant in a criminal case never has any duty to testify or come forward with any evidence.  This is because, as I have told you, the burden of proof beyond a reasonable doubt remains on the government at all times, and [the defendant] is presumed innocent.  In this case, [the defendant] did testify and he was subject to cross-examination like any other witness.  You should examine and evaluate the testimony just as you would the testimony of any witness with an interest in the outcome of the case.

Gaines, 457 F.3d at 249 n.9 (alterations in original).

of innocence, and was therefore constitutional error, see Estelle, 425 U.S. at 503 ("The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice."); Gaines, 457 F.3d at 245, the standard for harmlessness is the familiar one established by Chapman v. California, 386 U.S. 18 (1967): "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Id. at 24. This requires a negative answer to "whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction." Id. (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963)). Where, as here, the error was preserved, the burden of establishing harmlessness is on the government. United States v. Olano, 507 U.S. 725, 734 (1993); United States v. Quattrone, 441 F.3d 153, 181 (2d Cir. 2006).

Based on the evidence presented at trial, it is plain that under the Chapman standard the error in the instruction did not contribute to Brutus' convictions. This was not a close case. Even assuming that the jury would have credited Brutus' testimony that the agents informed her of the possible time she faced before she gave her confession, we are confident that the jury would have rejected the balance of her trial testimony in favor of the version in her confession. Not only was the veracity of

18

her confession inherently plausible, her contrary story at trial was manifestly incredible, prompting the experienced Judge Glasser to note at sentencing that it was "the most incredible perjury I've ever heard in any case I've ever tried in this court."

During Brutus' initial airport interview, she gave a particularized account of her involvement in smuggling the seized cocaine. The details for her confession were not the product of leading questions. To the contrary, Brutus volunteered to the agents extensive information on who recruited her for the trip; how much she was paid; and how she was to effect delivery of the drugs in the United States. After the attempted controlled delivery of the drugs failed, Brutus then told the agents her back-up plan and provided them with her recruiter's telephone number. Her second airport interview was even more extensive. She told the agents how she met her recruiter; how a man told her to change her flight destination from Miami to New York; and how that man gave her the drugs on the morning of her flight to New York. She further explained that she agreed to smuggle the drugs because she needed money to pay her rent, which was corroborated by rent notice slips found in her suitcase.

Brutus also volunteered her involvement in a prior drug smuggling venture. She told the agents who arranged the trip; how the drugs were concealed (in wooden voodoo statues); to whom

19

she delivered the drugs; and how much she was paid for her efforts. She also provided detailed descriptions of all the participants. In sum, the exhaustive detail of the defendant's confessions as to the offenses of conviction and her prior drug smuggling trip belies her contention that she made up these stories to cooperate with authorities.

On the other hand, Brutus' trial testimony of the events leading up to her August 2005 arrival at JFK airport made virtually no sense. She testified that she planned to stay with Alina while applying for jobs, but she admitted that she had never informed Alina that she would be arriving in August after testifying that she had told Alina she would be coming in September. She denied that she ever informed her family of her plans, but when asked why, her excuse was that the father of her youngest child would not have given his permission. Yet she was at a loss to explain why the father's permission was necessary or why it would not be forthcoming.

Lastly, the jury heard an absurd story regarding the financing of Brutus' airfare from Haiti to New York and from New York to Miami. Brutus implausibly claimed that Marjorie paid for the $509.15 ticket from Haiti to New York because she wanted Brutus to deliver sandals to a friend. As for the return trip to Miami, Brutus' story was that she expected Alina to pay for the flight.

Faced with what Judge Glasser termed "the most incredible perjury," it is plain to us that an appropriate jury instruction on assessing the defendant's testimony would have yielded exactly the same result and that the error was therefore harmless beyond a reasonable doubt.

**<u>CONCLUSION</u>**

For the foregoing reasons, we AFFIRM the district court's judgment of conviction.