16-2585 (L)
*United States v. Mehta*

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term 2017

---

No. 16-2585(L)
No. 16-2598(CON)
No. 16-2606(CON)

United States of America,
*Appellee,*

*v.*

Gaurav Mehta,
*Defendant-Appellant,*

Mary Opoka,
*Defendant-Appellant,*

Isha Mehta,
*Defendant-Appellant.*

---

Appeal from the United States District Court
for the Northern District of New York
Thomas J. McAvoy, District Judge.
(Argued: May 21, 2018; Decided: March 21, 2019)

Before: Parker, Livingston, and Chin, *Circuit Judges.*

————

Appeal from judgments of conviction in the United States District Court for the Northern District of New York (McAvoy, *J.*). The defendants were convicted of marriage fraud and immigration fraud in violation of 8 U.S.C. § 1325(c) and 18 U.S.C. §§ 2, 1546(a). During the course of the trial, the judge met with certain jurors *ex parte* to discuss the jurors' concerns about two defendants' out-of-court behavior. He also instructed the jurors that they could consider the defendants' self-interest in the outcome of the case when analyzing their trial testimony. These errors compel us to **VACATE** the judgments of the District Court and **REMAND**.

————

DAVID B. GOODHAND, United States Department of Justice, Criminal Division, Appellate Section, Washington, DC, and STEVEN D. CLYMER, Assistant United States Attorney, *for* Grant C. Jaquith, United States Attorney for the Northern District of New York, Albany, NY, *for the United States of America.*

HARRY SANDICK, Patterson Belknap Webb & Tyler LLP, New York, NY, *for Gaurav Mehta.*

ERIC K. SCHILLINGER, Law Office of Eric K. Schillinger, East Greenbush, NY, *for Mary Opoka.*

ROBERT A. CULP, Law Office of Robert A. Culp, Garrison, NY, *for Isha Mehta.*

————

BARRINGTON D. PARKER, *Circuit Judge*:

Defendant Mary Opoka was convicted of marriage fraud, and defendants Gaurav Mehta and Isha Mehta were each convicted of both marriage fraud and immigration fraud. *See* 8 U.S.C. § 1325(c); 18 U.S.C. §§ 2, 1546(a). During the course of the trial in the United States District Court for the Northern District of New York (McAvoy, *J.*), the judge met *ex parte* with five jurors and discussed the jurors' concerns about two defendants' out-of-court behavior. In addition, the judge later instructed the jurors that, when analyzing the defendants' testimony, they could consider how the defendants' self-interest in the outcome of the case could create a motive to testify falsely. The circumstances of the meeting with the jurors and the jury charge relating to a testifying defendant's motivation to lie are directly contrary to the law of this Circuit. Because these errors undermine the presumption of innocence and our confidence in the fairness of the proceedings, we vacate the judgments and remand.

## BACKGROUND

Gaurav Mehta ("Gaurav"), Isha Mehta ("Isha"), and their son were issued tourist visas in 2009 to enter the United States from India for six months. While in the United States, Gaurav married Mary Opoka ("Opoka") and Isha married Brandon Johnson ("Johnson"), both of whom were U.S. citizens. Gaurav and Isha then applied to adjust their statuses to lawful permanent residents.

Following a minor car accident, Isha was questioned by police officers, and her responses raised suspicions about her marriage to Johnson. This incident triggered an investigation by immigration agents into Isha's marriage to Johnson and Gaurav's marriage to Opoka. The investigation yielded evidence that suggested that Gaurav and Isha's marriages were fraudulent. Gaurav, Isha, and Opoka were eventually arrested and indicted. Gaurav and Isha were charged with marriage fraud and immigration fraud, and Opoka was charged with marriage fraud. *See* 8 U.S.C. § 1325(c); 18 U.S.C. §§ 2, 1546(a).

Trial commenced on October 27, 2015. On the third day, after the jury had been excused and counsel was waiting to meet the judge in chambers, the court clerk informed the judge that several jurors wished to speak with him. Without

4

notifying counsel of the request, the judge entered the jury room to speak with the jurors. On the record, he stated:

> We are here in the jury room and there are several jurors here—five to be exact—and they had asked some questions of my clerk, and I thought it would be best if I listened to their questions and it doesn't have to do with the merits of the case, it's something else, as I understand, and I will listen to what you have to say and see what I can do for you.

Joint Appendix ("J.A.") at 769. One juror, speaking for the other jurors, told the judge that she was concerned by two of the defendants' behavior outside the courthouse:

> I've been coming into the building and going out, [Gaurav and Opoka] have been kind of lingering and staring, like, walking noticeably slow and I feel like I see them, see me, if I was coming in, even if I've been behind them, like, from the second floor parking ramp to the entrance. It's pretty obvious route and they have—feel like they were lollygagging . . . .

*Id.* As the jurors were expressing their concerns, the judge stated: "That's disturbing. I think what I would do, if you don't mind, would be assign a court security officer to accompany you to your cars. Would that help?" *Id.* at 769–70.

The jurors responded in the affirmative. *Id.* at 770. The judge went on to say:

> I don't know why they are doing that. I mean, I've been doing this for years and years and once in a while you get somebody that acts inappropriate like that but I think we should have a court security

5

officer there and I will talk with staff and have somebody ready for you tomorrow.

*Id*.

After the remaining jurors departed, the judge informed counsel that the *ex parte* meeting had occurred.  *Id.* at 771–72.  The judge did not have the transcript read to counsel, but provided a summary as follows:

> [One of the jurors] said that she was concerned because as she walked to and from her car, [Gaurav and Opoka] . . . would sort of follow them and stare at them and it made them very, very nervous and that—so they wanted to know what I could do about it.  I said, well, I'll try to assign a court security officer to you to accompany you to your vehicles. . . . Anyway, they didn't all seem to be upset but a couple of them seemed pretty nervous and the other three just kind of were there for, like, fillers. I listened to their concerns anyway.

*Id*. at 772.  The judge then instructed counsel to tell their clients "to stay the hell away from the [jury]."  *Id.*

After the judge's explanation of the *ex parte* meeting, the defendants moved for judgments of acquittal.  The motions were denied.  At that point, Isha's counsel also asked for a mistrial because he was concerned that the jury's fear of Gaurav and Opoka might affect the jury's perception of Isha.[1]  *Id.* at 781.

---

[1]     Counsel for Isha stated:

Before we go to the charge conference, Judge, based upon what you relayed to us,

The judge denied the motion, explaining that "nothing" he heard in the meeting suggested "that [the jurors] made up their mind[s] about guilt or innocence." *Id.* at 781.

In the course of that conversation, counsel for Gaurav addressed the judge: "We don't know what the testimony—Judge hasn't told us everything they said," *id.* at 782, and the judge responded: "I told you everything that I thought . . . ha[d] to do with the issue of what I had to do to make [the jurors] feel comfortable," *id.* at 782–83. Opoka's counsel also expressed his concerns about the accuracy of the jury's account:

> It does concern me only because [Gaurav], walking out of the courthouse last night with my client and with Ms. Mehta and the three of us [defense counsel] walked out, [counsel for Isha] was walking out 20 yards in front of us but I'm not sure if they are referencing me leaving the courthouse at night when this would have transpired. This was with both my client and [Gaurav] and [counsel for Gaurav] was in close proximity when they were leaving.

I'm going to ask as to a mistrial as to Mrs. Johnson. The jurors are concerned about conduct between Mrs. Mehta and Mr. Mehta and I'm concerned it would spill over to her, and there's no reason it should because she didn't do anything wrong. I don't know if [Gaurav and Opoka] did but [Isha] did not and we have at least three, maybe four jurors concerned about that, and I would ask for a mistrial.

J.A. 781.

7

*Id.* at 783.  The judge, attempting to assuage counsel's concerns, explained his reason for assigning security:

> I don't know. The jurors perceive something that wasn't really happening, maybe they are just first-time jurors and they are all a little nervous about the process and reading something into what was really innocent behavior.  I'm not saying it's against your defendants.  I'm just saying I want to make the jury feel comfortable.  Many occasions I have had jurors accompanied by [security officers] going between this courthouse and the parking ramp and also the Binghamton courthouse.  It's not unusual for it to happen.

*Id.*  The judge did not, however, report that he had used words like "disturbing" and "inappropriate" in his meeting with the five jurors, nor did he state that he had told the jurors that, in his "years and years" of presiding at trials, this situation was unusual.  *Id.* at 769–70.  After this discussion, the judge did not go on to inquire as to whether the apprehensions expressed by the jurors with whom he met were shared by other jurors who were not present at the conference.  Moreover, no inquiry was made of any of the jurors as to whether they could remain impartial.

After the close of evidence, when charging the jury, the judge stated: "You may consider the fact that a defendant's interest in the outcome of the case creates a motive for false testimony, but it by no means follows that a defendant

8

is not capable of telling the truth." *Id.* at 1093. Defense counsel failed to object to the instruction at the time it was given. Additionally, on the elements of § 1325(c), the judge charged the jury that marriage fraud occurred if the defendant "would not have entered the marriage unless the purpose was to avoid the immigration laws relating to aliens remaining in the United States." *Id.* at 1100. He further charged that if the marriages in question "were entered for legitimate reasons, then there is no evasion of the immigration law." *Id.* Isha had objected to this charge, asking the judge to instruct the jury that marriage fraud occurs only when a person enters into a marriage "*without intending to live together as husband and wife*, for the purpose of evading the immigration laws of the United States." *Id.* at 35, 788 (emphasis added). The judge denied Isha's request. Following its deliberations, the jury convicted the three defendants on all counts, and the judge sentenced each to three years' probation.

The defendants raise a number of issues on appeal. Although we do not question the judge's conscientiousness and good faith, we nonetheless conclude that his *ex parte* meeting with the jurors and his instruction about assessing the credibility of a testifying defendant were sufficiently sharp departures from the

9

law of this Circuit as to undermine our confidence in the fairness of the trial. For the reasons expressed below, the judgments are vacated and the cases are remanded for further proceedings.

STANDARD OF REVIEW

We will reverse a violation of a defendant's right to be present at every trial stage when the error is not harmless. *United States v. Collins*, 665 F.3d 454, 460 (2d Cir. 2012). An error is not harmless if there is a reasonable possibility that the error complained of might have contributed to the conviction. *United States v. Brutus*, 505 F.3d 80, 88 (2d Cir. 2007). For other errors to which counsel failed to object, we will review for plain error. Fed. R. Crim. P. 52(b). We may correct an error that is clear and obvious, affected the defendants' substantial rights, and seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732–36 (1993).

DISCUSSION

I

A defendant in a criminal case has the right, rooted in the Sixth Amendment Confrontation Clause and Fifth Amendment Due Process Clause, to

be present at every trial stage. *Collins*, 665 F.3d at 459; *United States v. Canady*, 126 F.3d 352, 360 (2d Cir. 1997) ("The defendant's right to be present at every stage of trial is scarcely less important to the accused than the right of trial itself."). "The right to be present has been extended to require that messages from a jury should be disclosed to counsel and that counsel should be afforded an opportunity to be heard before the trial judge responds." *United States v. Mejia*, 356 F.3d 470, 474 (2d Cir. 2004).

In *United States v. Collins*, we reiterated the practices to be followed when the district court receives an inquiry from a jury:

> (1) the jury inquiry should be in writing; (2) the note should be marked as the court's exhibit and read into the record with counsel and defendant present; (3) counsel should have an opportunity to suggest a response, and the judge should inform counsel of the response to be given; and (4) on the recall of the jury, the trial judge should read the note into the record, allowing an opportunity to the jury to correct the inquiry or to elaborate upon it.

665 F.3d at 460 (quoting *Mejia*, 356 F.3d at 475). Additionally, we have been clear that "the trial court should not respond to a jury note in an *ex parte* manner" because such communications are "pregnant with possibilities for error" and

11

"unexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views." *Id.*

Here, our instructions in *Collins* were not followed, and that failure was clear and obvious error. The jurors were not asked to put their inquiries in writing. Rather, after receiving notification from the clerk, the judge went into the jury room and met with the five jurors who had asked to speak with him. As *Collins* warned, the judge found himself required to respond to unexpected questions in a context where it was difficult to anticipate, much less contain, the direction the conversation would take. *See id.*

Neither the defendants nor counsel were informed before the *ex parte* meeting that the judge had received an inquiry. Consequently, counsel could neither suggest how to handle the inquiry nor comment on the judge's proposed response. *See United States v. Ronder*, 639 F.2d 931, 935 (2d Cir. 1981) (reversing where trial court failed to discuss several jury notes with counsel because disclosure of at least one of the notes "might well have prompted counsel to suggest a response appropriately tailored to the circumstances"). This lost opportunity was in no sense a formality. The crimes charged in the indictment

were non-violent crimes. Yet the judge's comments to the jurors strongly implied that the defendants posed some threat of physical danger to the jurors. After being informed by the jurors that they believed they were being observed by two of the defendants, the judge described the defendants' behavior as "disturbing," "inappropriate," and unusual in his "years and years" of experience. J.A. 769–70. Had defense counsel been given an opportunity to respond, they likely would have provided an alternative account of the circumstances, and one that could well have fully addressed the jurors' perceived safety concerns.

Moreover, the judge's account of the meeting to counsel did not fully capture the extent of the discussions at the *ex parte* meeting. For example, the judge did not mention that he had described the two defendants' behavior as "disturbing" and "inappropriate" without inquiring into the rationale behind the jurors' reactions. *Id.* Instead, the judge assured counsel that he had simply made the jurors feel comfortable and had not acted beyond the bounds of ordinary practice. *Id.* at 782–83.

The judge also failed to take action to mitigate the prejudicial effects of the *ex parte* meeting. *See, e.g., Sher v. Stoughton*, 666 F.2d 791, 793–95 (2d Cir. 1981) (finding no prejudice where the judge had conducted prompt voir dire and offered curative instructions after a potentially prejudicial call to jurors). For example, the content of the meeting was never discussed with the full jury, leaving the other jurors to speculate as to what had happened in the private meeting. This omission created the very real risk that some or all of the jurors reached unfounded conclusions about the defendants, either on their own or through informal discussions with other jurors, without any guidance from the District Court or from counsel. Further, the jurors were never asked if they could remain impartial despite knowledge that some jurors harbored apprehensions about the defendants. *See id.* (finding no prejudice where each juror assured court that they could remain impartial).

We do not suggest that such an inquiry is necessary whenever a juror raises a security concern. "The mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per

14

curiam). Taken collectively, however, the aforementioned decisions run contrary to our instructions on the handling of jury communications and implicate the precise concerns that animated our decision in *Collins*.

**II**

The prejudice resulting from the *ex parte* meeting was compounded by the charge to the jury that it "may consider the fact that a defendant's interest in the outcome of the case creates a motive for false testimony." J.A. 1093. We have repeatedly held, in no uncertain terms, that this charge is forbidden; district courts may not tell juries that a testifying defendant's personal interest in the outcome of a trial supplies a motive to lie.

In *United States v. Gaines*, we held that "district courts should not instruct juries to the effect that a testifying defendant has a deep personal interest in the case." 457 F.3d 238, 249 (2d Cir. 2006). A year later, we held in *United States v. Brutus* that such an instruction "undermines the presumption of innocence because it presupposes the defendant's guilt." 505 F.3d at 87. The instruction is impermissible, we stated, even if it is "balanced by other, more favorable language," such as a district court's instruction that a defendant may have

15

testified truthfully despite having an interest in the outcome of the trial. *Id.* Indeed, the Government concedes that the District Court's instruction violated this Circuit's law.[2] *See* Appellee's Br. at 41. It is therefore undisputed that the instruction constituted clear and obvious error.[3]

## III

The presumption of innocence "is the undoubted law, axiomatic and elementary." *Gaines*, 457 F.3d at 245 (quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)). "To implement the presumption, the Supreme Court has warned, courts must be alert to factors that may undermine the fairness of the fact-finding process." *Brutus*, 505 F.3d at 85 (quoting *Estelle v. Williams*, 425 U.S. 501, 503

---

[2] Nevertheless, the Government argues that the error did not affect the defendants' substantial rights or the fairness, integrity, or public reputation of the proceedings. Appellee's Br. at 41.

[3] In *Brutus* and *Gaines*, we recommended language that properly instructs the jury on how to evaluate a defendant's testimony:

> You should judge the defendant's testimony in the same way that you judge the testimony of any other witness.
> . . . .
> The defendant in a criminal case never has any duty to testify or come forward with any evidence. This is because, as I have told you, the burden of proof beyond a reasonable doubt remains on the government at all times, and the defendant is presumed innocent. . . .

505 F.3d at 88 nn. 6–7 (quoting *Gaines*, 457 F.3d at 249 nn. 8–9).

(1976)). We conclude that the errors in question jeopardized the fairness of the proceedings and compel us to vacate the judgments of conviction.

The charging error undermined the presumption of innocence, which is not only one of the most fundamental principles of our criminal justice system, but also one of the principles most widely known and understood by the public at large. *See Gaines*, 457 F.3d at 245. Further, the effect of the error was amplified by the manner in which the inquiry from the jurors was handled. Specifically, the *ex parte* meeting and its aftermath compromised the integrity of the jury process, thus violating the defendants' substantial rights. This case boiled down to the jury's determinations of the defendants' credibility. *See Gaines*, 457 F.3d at 250. Based on our review of the evidence presented at trial, there is a reasonable probability that the errors complained of might have contributed to the convictions. *See Brutus*, 505 F.3d at 88. Furthermore, the errors no doubt undermined the fairness, integrity, and public reputation of the judicial proceedings. *See Gaines*, 457 F.3d at 245–46. We therefore vacate the defendants' convictions and remand for retrial.

17

# IV

Defendants were charged under § 1325(c), which provides that an individual who "knowingly enters into a marriage for the purpose of evading any provision of the immigration laws" commits marriage fraud. 8 U.S.C. § 1325(c). Isha requested the following jury instruction on the marriage fraud charge:

> In order to find a person guilty of marriage fraud the government must prove beyond a reasonable doubt that a person knowingly entered into a marriage *without intending to live together as husband and wife,* for the purpose of evading the immigration laws of the United States.

J.A. 35 (emphasis added). The judge did not adopt this language, and instead instructed the jury:

> If the marriages referenced in counts one and four *were entered for legitimate reasons,* then there is no evasion of the immigration law. . . . You must determine whether the defendant you are considering would not have entered the marriage *unless* the purpose was to avoid the immigration laws relating to aliens remaining in the United States.

*Id.* at 1100 (emphasis added). Defendants argue that the failure to include their proposed "intent to live together as husband and wife" language was error

18

because it allowed the jury to convict even if the defendants had legitimate motivations, in addition to obtaining immigration benefits, for entering into their respective marriages. We disagree.

As an initial matter, defendants are not entitled to have the exact language they propose read to the jury. *United States v. Russo*, 74 F.3d 1383, 1393 (2d Cir. 1996). The trial court has substantial discretion to fashion the language of jury instructions, so long as it is fair to both sides. *Id.* The judge's instructions were fair to both sides, and in fact adequately addressed the very concerns the defendants raise on appeal. The judge instructed the jury that if there were legitimate reasons for the defendants' marriages, they could not be convicted of marriage fraud. He also instructed the jury that if the defendants would have entered the marriage for other legitimate reasons, notwithstanding the immigration benefits they would receive, they could not be convicted of marriage fraud.

In any case, the judge's instructions are in accordance with the law of our Circuit. *See, e.g.*, 2 Leonard B. Sand et al., *Modern Federal Jury Instructions-Criminal* ¶ 33A.07 cmt. (2018) (explaining that the purposeful evasion element of § 1325(c)

"requires the government to prove that the marriage was a sham, entered into by the defendant only for the purpose of evading the immigration laws").  Thus, the District Court did not err in rejecting the proposed instruction.

## CONCLUSION

For the reasons set forth, we **VACATE** the judgments of the District Court and **REMAND** for proceedings consistent with this opinion.