18-3403-cr
USA v. Solano

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2019

(Argued:  January 7, 2020        Decided: July 22, 2020)

Docket No. 18-3403-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

- v. -

JUAN SOLANO,

*Defendant-Appellant*.

_____

Before:  KEARSE, CALABRESI, and CARNEY, *Circuit Judges*.

Appeal from so much of a judgment, entered in the United States District Court for the Eastern District of New York following a jury trial before LaShann DeArcy Hall, *Judge*, as convicted defendant of attempted possession of cocaine with intent to distribute.  On appeal, defendant, who testified at trial, contends that the

district court erred by instructing the jury that "any" witness with "an interest in the outcome" of the trial had "a motive . . . to testify falsely." Concluding that the instruction was plain error and that there is a reasonable probability that defendant was prejudiced by it, we vacate the conviction and remand for such further proceedings as may be appropriate.

Vacated and remanded.

ALEXANDER MINDLIN, Assistant United States Attorney, Brooklyn, New York (Richard P. Donoghue, United States Attorney for the Eastern District of New York, Jo Ann M. Navickas, Assistant United States Attorney, Brooklyn, New York, on the brief), *for Appellee*.

DANIEL HABIB, New York, New York (Federal Defenders of New York, Inc., Appeals Bureau, New York, New York, on the brief), *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant Juan Solano appeals from so much of a judgment, entered in the United States District Court for the Eastern District of New York following a jury trial before LaShann DeArcy Hall, *Judge*, as convicted him on one count of attempted

2

possession with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii)(II), and 846.  On appeal, Solano, who testified at trial, contends that the district court erred in instructing the jury that "any" witness who had an interest in the outcome of the trial had a motive to testify falsely.  Concluding that, with regard to this trial, in which there were serious questions of credibility, the instruction was plain error and that there is a reasonable probability that Solano was prejudiced by it, we vacate his conviction and remand for such further proceedings as may be appropriate.

## I.  BACKGROUND

Solano was indicted on one count of conspiring to distribute and possess with intent to distribute cocaine, and one count of attempting to possess cocaine with intent to distribute.  After a four-day jury trial, he was acquitted on the conspiracy count but convicted of attempt.

The prosecution arose out of events on the afternoon of June 7, 2016, when Solano, a longtime commercial truck driver who had been engaged that morning to pick up a shipping container from the Red Hook Container Terminal in

Brooklyn ("Red Hook" or the "Terminal"), went to the Terminal to pick up the container, and, concerned that it might contain contraband, telephoned Homeland Security Investigations ("HSI") Special Agent Brian Dalrymple to inquire whether there was any "problem" with the container. There was. But that was only the first of many problems with this case.

A. *The Trial Evidence*

Most of the relevant facts are not in dispute. On June 1, 2016, United States Customs and Border Protection ("CBP") officers, conducting cargo examinations of sealed shipping containers at Red Hook, discovered in one of the containers (the "Container") packages of a white powdery substance in boxes of produce. The substance field-tested positive for cocaine; the packages weighed approximately 13.59 kilograms. (*See* Trial Transcript ("Tr.") 37, 41.) CBP confiscated the cocaine (the "June 1 Seizure"), subjected the Container to an "agriculture hold"-- technically used to prevent removal of a container from a terminal until CBP can determine whether the produce cargo is safe for public consumption--and promptly alerted HSI to the June 1 Seizure. (*Id*. at 29.)

4

HSI decided to attempt a controlled delivery of the Container. The boxes were refilled with the produce--minus the packages of cocaine--and returned to the Container. The Container was resealed; and the "agriculture hold" was eventually lifted, freeing the Container for removal from the Terminal on June 6. On that day, seven or eight members of an HSI task force, each in an unmarked law enforcement vehicle, were positioned inside the Terminal or nearby, in order to follow transport of the Container to determine where--and to whom--it would be delivered. (*See id*. at 101-03.)

On June 7, Solano arrived at Red Hook, picked up the sealed Container and, followed by task force surveillance vehicles, drove it from Brooklyn, through Manhattan, to a warehouse in the Bronx. While at Red Hook, Solano had telephoned HSI Special Agent Dalrymple to ask whether there were any problems with the Container; by the time Dalrymple called Solano back to say there was no problem, Solano had already left the Terminal with the Container. (*See id*. at 123, 229-32, 246.) Solano sent Dalrymple a text message stating the address at which Solano was to deliver the Container, along with the contact information for Jimmy Machuca, the person who had engaged him for the job and given him the delivery instructions. (*See id*. at 286.) Shortly after Solano delivered the Container to the Bronx warehouse and

departed, he was arrested and taken to an HSI office in Manhattan. (*See id*. at 108, 113-14, 322, 378.)

The disputed issue at trial was whether Solano had known prior to leaving the Terminal that the Container contained narcotics. The principal differences in the evidence concerned what postarrest statements Solano made at the HSI office. The trial evidence as to Solano's statements on June 7, and as to his prior encounters with law enforcement agents, included the following.

1. *Solano's Prior Interactions with Law Enforcement*

By June 2016, Solano had been a commercial truck driver in the United States for some 20 years, principally transporting containers of fruit from ports of entry to commercial warehouses. For the last 10 years, he had visited the ports of New York and New Jersey to pick up such containers nearly every day. (*See* Tr. 464-65.) He estimated that he picked up and delivered nearly 250 containers a year, and over his professional life had transported thousands. (*See id*. at 185.) Prior to the events in this case, Solano, who had no criminal record, had been interviewed by law enforcement agents with respect to two controlled deliveries of narcotics

found in containers at New York area ports, after the containers had been delivered to their respective destinations by Solano.

In July 2014, CBP officers had discovered cocaine in a container in a warehouse in Elizabeth, New Jersey. After CBP and HSI removed the cocaine and resealed the container, Solano picked up the container and drove it to another warehouse in Wayne, New Jersey. (*See id*. at 254.) Solano was thereafter interviewed several times by HSI Special Agent Dalrymple. On each occasion Solano received *Miranda* warnings, waived his *Miranda* rights, and answered all of Dalrymple's questions. (*See id*. at 259-60, 265-66, 272-77.) Dalrymple told Solano that drugs had been found in the container; Solano was not arrested. (*See id*. at 228.) Dalrymple gave Solano his phone number in case Solano remembered anything else about the case (*see, e.g.*, Tr. 229, 272, 278); and he "may have" asked Solano to let him know if Solano "ever learned of anything illegal going on" (*id*. at 278).

In January 2016, CBP had discovered heroin and cocaine in a container at Red Hook Terminal. The drugs were removed, and the container was resealed for a controlled delivery. This container too was picked up by Solano, who drove it to a warehouse in Linden, New Jersey, where it turned out there was no one to receive it; he then took it to a truck yard in Jersey City, New Jersey, where it remained

7

overnight, until he drove it to a warehouse in the Bronx. (*See* Tr. 478-79.) Solano was subsequently interviewed twice by New York Police Department Detective Michael Corvi, a member of an HSI task force focusing on smuggling at New York area ports. Solano produced the delivery order he had been given and answered the questions asked of him, including identifying the person who had arranged the delivery. Solano was not arrested. (*See id*. at 318, 320, 554.)

2. *Evidence as to Solano's June 7, 2016 Postarrest Statements*

After his arrest on June 7, Solano was interviewed twice that evening, with the second interview having two stages. The government presented evidence from three witnesses (collectively the "officer witnesses" or "officers") as to statements made by Solano during those interviews: HSI Special Agent Lennis Barrois ("Barrois" or "Lennis"), who was the agent in charge of following up on the June 1 Seizure; HSI Supervising Special Agent Robert Etienne, who supervised HSI special agents and task force members; and HSI task force member Corvi. Solano testified in defense.

8

a. *Testimony of Barrois and Corvi as to Interview # 1*

The first interview of Solano on the evening of June 7 was conducted by Barrois and Corvi. Barrois took notes. (*See* Tr. 181.) Barrois testified that Solano said the Container originally was to have been picked up on June 6 for importer-exporter Jimmy Machuca by Solano's boss, Edwin Pacheco; but Pacheco had not picked up the Container because he had not been feeling well. (*See id*. at 114.) While Solano was at a warehouse in the Bronx where he had just made a delivery to a produce wholesaler, he received a call from Machuca asking him to pick up the Container, and he agreed to do so. Solano said that when he mentioned this to the produce wholesaler's manager Javier Montalvo, Montalvo warned "that Machuca was bad and the load was suspicious," which Solano said "he took . . . to mean that Machuca wrote bad checks and didn't pay his . . . truck drivers on time." (*Id*. at 115.) Solano told the officers that he did not know the Container held drugs. (*See id*. at 115, 305.)

Corvi gave substantially the same description as Barrois as to what Solano said at that first June 7 interview. Following the interview, Solano was placed in a holding cell.

b. *Testimony of Etienne as to Interview # 2, First Phase*

Etienne testified that, as supervisor he "ha[d] to make sure everything's okay," and after the first interview ended he went to inquire whether Solano wanted water or needed to use the restroom. (*See* Tr. 354.) At that time, Solano said he wanted to speak to the officers again. Etienne then brought Solano back to the interview room.

Etienne informed Corvi of Solano's request and looked for Barrois but could not find him. Etienne attended the first part of this second interview, with Corvi, bringing along another HSI special agent (who was not called as a witness at trial). In this phase of interview # 2, Etienne questioned Solano, and Corvi took notes. (*See id*. at 328, 355-60; *see also id*. at 328 (Corvi testified that he too asked questions).)

Initially in this phase of interview # 2, Solano continued to state that "Jimmy Machuca told [him] to pick up the container," (*id*. at 355), and that although Montalvo warned him, "[t]hat container's bad. Be careful" (*id*. at 356), Solano merely thought Montalvo meant that Machuca "wrote bad checks" (*id*. at 358). Etienne accused Solano of lying and knowing that the Container held drugs, based on the fact that two people--Montalvo and Pacheco--both told him something was "bad." (*Id*. at 356-57.) Solano maintained that he did not know about the drugs and pointed out

10

that he had called HSI Special Agent Dalrymple to be sure there was no problem. (*See id*. at 356.)

Etienne persisted, asking whether Solano believed "bad" had meant "Bombs? Grenades? Weapons? Drugs?" and testified that Solano reacted differently when Etienne said "Drugs," and that when Etienne repeated "Drugs? [Solano] said, Yes." (Tr. 359.) Etienne testified that Solano then admitted that he knew the Container held drugs when Montalvo warned him about Machuca. Etienne asked whether Solano had knowingly transported drugs before, and when Solano said he had not, Etienne accused him of lying, and Solano admitted that he had knowingly transported drugs on two other occasions for someone named "Lennyn" [*sic*] (*id*. at 362-65).

Etienne testified that he immediately interrupted interview # 2 in order to find Barrois and have Solano repeat his admissions:

I said, Hold on a second. I went to find Special Agent Lennis. I brought Lennis in, right? *I recapped everything in front of Lennis, Detective Corvi, and Juan*.

I said, Lennis, Juan has come around. Juan knows--knows for a fact that there was drugs in that container. . . .

I said, Juan, thank you for your honesty. I appreciate it. Now, *Juan I want you to tell exactly the same thing over again to*

11

*Special Agent Lennis and Detective Corvi again so they could **make sure everything is documented properly.***

I walked out of the office at that time.

(Tr. 365-366 (emphases added).)

c. *Testimony of Barrois as to Interview # 2, Second Phase*

Barrois, thus brought back in for the end of interview # 2, testified that

[i]n the second interview I conducted, [Solano] admitted to knowing that the container had narcotics, and that he had picked up another container for an individual named Lennyn [*sic*] sometime in March of 2015 in the Pennsylvania area.

(*Id*. at 117.) Barrois testified that Solano said Montalvo had warned him about the container, and Solano "said he knew that the container contained drugs." (*Id*.) Barrois testified that Solano provided details about his Pennsylvania trips (*see id*. at 117-19) and discussed another person named "Tyrone" who "facilitates drugs" (*id*. at 119; *see id*. at 123).

Although Barrois had taken notes in Solano's first interview, those notes reflected only that Solano had denied knowledge that the Container contained drugs. And while Barrois testified that in interview # 2 Solano confessed to having known that the Container contained drugs, Barrois took no notes during that interview. (*See*

12

Tr. 182.) Barrois had a cellphone with which he could have recorded the interrogation; but in early June 2016, HSI agents were not required to record interrogations, and in interviewing Solano they chose not to do so. (*See* Tr. 179; *id*. at 375-76 (Etienne testified that at that time, it was the "prerogative" of the agent conducting an interview to decide whether or not to record it).)

d. *Testimony of Corvi as to Interview # 2, Second Phase*

Corvi, who had been at interview # 1, was also present for interview # 2. In interview # 2, Corvi asked some questions and took notes. (*See, e.g.*, Tr. 328.) He testified that in interview # 2, Solano said he had spoken to Montalvo before going to Red Hook to pick up the Container, which Pacheco had declined to pick up the day before because there was something wrong with it. Corvi testified that Solano said he knew, when Montalvo told him to be careful, it was because the Container held drugs. (*See id*. at 329-31.)

Corvi apparently was the only officer to take notes during interview # 2. And despite his recognition that a confession of knowledge of the drugs would be "an important admission in a drug investigation" (*id*. at 330)--and despite Supervising Special Agent Etienne's having made a point of wanting his officers to "make sure

13

everything [wa]s documented properly" (Tr. 366)--the officers did not ask Solano to sign a statement saying that he had known the Container contained drugs. Moreover, the notes made by Corvi during interview # 2 did not state that Solano said he knew the Container contained drugs. Indeed, with respect to the Container and the June 1 Seizure, Corvi's notes did not make any mention whatever of drugs.

e. *Testimony of Solano*

Solano testified that what occurred on the morning of June 7 was essentially as the officers described his statements in interview # 1. He received a call that morning from Machuca asking him to pick up a container that day. (*See* Tr. 486.) Montalvo told Solano to "be careful with Machuca because . . . it's kind of hard to get him to pay." (*Id*.) Solano testified that Montalvo did not mention anything to him about Machuca being involved with drugs. (*See id*.) Solano testified that Montalvo also told him that Pacheco had gone to pick up Machuca's container, but did not because he "said something about it smelled bad." (*Id*. at 487.) Solano asked if that meant that there were drugs in the Container and Montalvo told him that it did not. (*See id*. at 549.) Solano agreed to pick up Machuca's Container, in part because he would earn the normal fee of $600, and in part because the Container was at Red

14

Hook, where Solano was headed to deliver an empty container. (*See id*. at 480-81, 490.)

Solano acknowledged that after interview # 1 he had asked to have a second interview with the officers. However, he testified that he did not in interview # 2--and did not ever--tell his interrogators that he knew there were drugs in the Container before he drove it from the Terminal. (*See, e.g., id*. at 504, 505, 507-08.)

Solano testified that he again told his questioners that Montalvo told him to be careful with Machuca because it was difficult to get Machuca to pay, and that Montalvo did not indicate there was a problem about drugs; he testified that Montalvo said he had never heard of Machuca being involved with drugs. (*See id*. at 507, 486, 549.) Solano told the officers that he "more or less realized" that the Container likely contained drugs only after he left Red Hook and saw that certain cars were following him. (Tr. 507-08; *see, e.g., id*. at 499 (Solano testified that he "really realized it in Manhattan" while driving up First Avenue; "[m]y truck is slow, and everyone else was passing me by, except them.").)

Solano also denied that he had told the officers that he had transported drugs knowingly for anyone else in the past. He had instead described "rumors" that he had heard about a man called "Lenin" [*sic*] being involved in drugs; and though

15

he had transported containers for Lenin, that had been "[l]ong before" he heard those rumors. Solano said he told the officers that the cargoes he transported for Lenin never included drugs so far as he knew. (Tr. 510, 537.) And while he had also mentioned a person named Tyrone, he had not said or meant to imply that Tyrone was involved in drug smuggling. (*See id*. at 511.)

Solano also called as trial witnesses Machuca and Montalvo. Machuca, the owner of an import-export company, testified that he had no idea that there were drugs in the Container and that he never told Solano that there were drugs in the Container. Montalvo testified that when Pacheco told him the Container job smelled bad, he thought Pacheco was referring to Machuca's slow payment methods. (*See id*. at 432.) Montalvo testified that he had told Solano about Pacheco's refusal to pick up the Container for Machuca, and had given Solano the caveat about Machuca because "Machuca is famous in the Bronx for not paying in a timely fashion." (*Id*. at 429.)

3. *Evidence as to June 7 Miranda Warnings (or Not)*

Solano also testified that on the evening of June 7, the officers did not give him any *Miranda* warnings. At interview # 2 they asked whether he would allow them to look in his cellphone, and he agreed; he signed a consent form for that search,

16

which the government had produced (*see* Tr. 174). However, Solano testified that no one told him that evening that, *inter alia*, he had the right to talk to an attorney, or the right to remain silent, or that anything he said could be used against him in court. (*See id*. at 502.)

Barrois and Corvi, in contrast, testified that Barrois read *Miranda* warnings to Solano in interview # 1, that Solano said he understood his rights, and that he was willing to waive those rights. (*See id*. at 114, 324.) Barrois also testified that after he joined the second phase of interview # 2, "[w]e reminded [Solano] of his rights and [Solano] said he still understood and waived them." (*Id*. at 192.) Both Barrois and Corvi testified that Solano signed a form stating that *Miranda* warnings had been read to him and waiving his rights. (*See id*. at 173, 325.) However, neither was able to say where that form was filed.

Etienne did not give Solano *Miranda* warnings when he began interview # 2 (*see id*. at 381); he testified that he thought he had asked Barrois whether Solano had received the warnings--until he was reminded that at that time he had been unable to find Barrois. (*See id*. at 380.) He then recalled that after interview # 1 either Barrois or Corvi had reported to him on that interview, saying "that [Solano] didn't say much. He waived but he didn't say much." (*Id*. at 381.)

Etienne testified that it was routine procedure for HSI agents to retain a signed *Miranda* waiver form for the investigative file as "an important piece of evidence in the case." (*Id*. at 371). However, he did not remember whether he had ever seen a signed waiver form from Solano (*see id*. at 381-82), and the government was unable to produce any written *Miranda* waiver signed by Solano on June 7.

B. *The Jury Instructions and the Verdicts*

Prior to trial, Solano submitted proposed jury instructions to the trial court, including two adapted from *United States v. Gaines*, 457 F.3d 238 (2d Cir. 2006) ("*Gaines*"), with respect to assessment of witness credibility and the testimony of a defendant:

> You are to decide whether the testimony of each witness was truthful and accurate, in whole, in part, or not at all, and you are to decide what weight, if any, to give to each witness's testimony. In evaluating each witness's testimony, you may consider, among other things, the witness's intelligence; the ability and opportunity the witness had to see, hear or know the things that the witness testified about; the witness's memory; any interest, bias, or prejudice the witness may have had; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all the evidence in the case.

18

(Defendant's Requests To Charge, Request No. 3 (citing *Gaines*, 457 F.3d at 249 n.8).)

As to the trial testimony of a defendant, Solano proposed the following instruction:

> In a criminal case, the defendant never has a duty to testify or come forward with any evidence. The reason is that, as I have told you, the defendant is presumed innocent and the government at all times has the burden of proof beyond a reasonable doubt. But, if he chooses, the defendant also has the right to testify and to take the witness stand on his own behalf. In this case, the defendant decided to testify, like any other witness, and he was subject to cross-examination, like any other witness. You should examine and evaluate the testimony of the defendant just as you would the testimony of any witness.

(Defendant's Requests To Charge, Request No. 9 (citing *Gaines*, 457 F.3d at 249 n.9).)

Prior to the end of the trial, the district court informed the parties of the substantive aspects of its proposed instructions, *i.e.*, the elements of the charged offenses; and it provided a list of the more procedural aspects it would address, such as burden of proof and presumption of innocence, but it did not provide the text of those topics. In a charging conference, the court stated generally that it would "include a charge about the defendant testifying" (Tr. 596); but there was no discussion of the content of that charge. Nor was there any discussion of the language proposed in Solano's Requests Nos. 3 and 9. The court never mentioned

19

Requests Nos. 3 and 9; and Solano's attorney never asked whether the court intended to give those requested instructions.

On the final day of trial, without having given the parties the text of its planned procedural instructions, the court charged the jury in pertinent part as follows with respect to assessments of witness credibility:

> [I]n evaluating the credibility of the witnesses, you should take into account evidence that the witness who testified may benefit in some[ ]way in the outcome of the case. *Such **an interest in the outcome creates a motive on the part of the witness to testify falsely**, may sway the witness to testify in a way that advances his own interest. Therefore, if you find that **any** witness who's [sic] testimony you are considering may have an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it with great care.*

> Now, this is not to suggest that every witness who has an interest in the outcome of the case will testify falsely. There are many people who no matter what their interest . . . in the outcome [of] a case may be would not testify falsely. It is for you to decide based on your own perceptions and common sense to what extent, if at all, the witness's interest has affected or colored his or her testimony.

(Tr. 673-74 (emphases added).) With respect to Solano's testimony, the court instructed:

> The defendant was not obligated to call witnesses on his behalf, nor was he obligated to testify on his behalf. But he was permit[ted] to do so. In this case the defendant decided to testify.

It is the prosecution's burden to prove the defendant guilty beyond a reasonable doubt. That burden remains with the prosecution throughout the entire trial and never shifts to the defendant. The defendant is never required to prove that he is innocent.

(Tr. 675.) When the court, after concluding its instructions, asked whether the parties had any problems with the charge, both sides said they did not. (*See id*. at 701.)

The jury found Solano not guilty of conspiring to distribute and possess with intent to distribute cocaine, but found him guilty of attempted possession of cocaine with intent to distribute. He was sentenced principally to 42 months' imprisonment, to be followed by a two-year term of supervised release.

# II. DISCUSSION

On appeal, acknowledging that he had not objected to the trial court's jury charge on assessment of the credibility of persons who testified at trial, Solano contends that in the context of this trial, in which he testified, the court's instructing the jury that "any witness who[] . . . ha[s] an interest in the outcome of this trial" has "a motive . . . to testify falsely" (Tr. 673) constituted plain error. For the reasons that follow, we agree.

21

A. *Plain-Error Review*

In order to be entitled to normal appellate review of a jury instruction, a party must make a proper objection "before the jury retires to deliberate." Fed. R. Crim. P. 30(d). A mere "request for an instruction before the jury retires" does not "preserve an objection to the instruction actually given by the court." *Jones v. United States*, 527 U.S. 373, 388 (1999). However, an unpreserved objection may be reviewed on appeal if it is "[a] plain error that affects substantial rights." Fed. R. Crim. P. 52(b). Under Rule 52(b),

> "before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.' If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'"

*United States v. Groysman*, 766 F.3d 147, 155 (2d Cir. 2014) ("*Groysman*") (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (which was quoting *United States v. Olano*, 507 U.S. 725, 732 (1993))). The burden is on the appellant to meet this standard. *See, e.g., United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004); *Groysman*, 766 F.3d at 155.

An error affects substantial rights when it is prejudicial--that is, when there is a "reasonable probability" that the error affected the outcome of the trial. *Dominguez Benitez*, 542 U.S. at 81-82 (internal quotation marks omitted). This does not mean that the defendant is required to show that he would more likely than not have received a different verdict, *see id*. at 83 n.9; rather, the standard is met if the error "'undermines confidence in the outcome of the trial,'" *Groysman*, 766 F.3d at 157 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

B. *Witness Credibility Instructions in Criminal Cases*

Proceedings in criminal cases are constrained by several bedrock constitutional principles. One is that a defendant has the right to, but is not required to, testify in his own defense at trial. Another is that the defendant is presumed innocent until proven guilty. Guided by these axioms, this Court in *Gaines*, 457 F.3d 238, and several cases since *Gaines*, has found error in various formulations of trial court instructions that made inroads into these fundamental principles.

In *Gaines*, the trial judge instructed the jury, in pertinent part, as follows:

> "The defendant in a criminal case never has any duty to testify or come forward with any evidence. This is because, as I've told you, the burden of proof beyond a reasonable doubt remains

23

on the government at all times, and Mr. Gaines is presumed innocent.

"In this case Mr. Gaines did testify and he was subject to cross-examination like any other witness. *Obviously, the defendant has a deep personal interest in the result of his prosecution.* **This interest creates a motive for false testimony** *and, therefore, the defendant['s] testimony should be scrutinized and weighed with care.* You should examine and evaluate his testimony just as you would the testimony of any witness with an interest in the outcome of this case. In appraising the defendant's credibility you may take that into account.

"*It by no means follows, however, that simply because a person has a vital interest in the end result he is not capable of telling a truthful and straightforward story.* It is for you to decide to what extent, if at all, the defendant's interest has affected or colored his testimony."

457 F.3d at 242 (emphases ours). In assessing this instruction, we recognized the fact that some witnesses, including some defendants, would have a motive to testify falsely; "[i]ndeed, in a perfect world, where prosecutors charged only the guilty, defendants would always have a motive to testify falsely." *Id*. at 246 (emphasis omitted). But we pointed out that

*an instruction that the defendant has a motive to testify falsely undermines the presumption of innocence.* In this regard, *there is an important distinction between a "motive to lie" instruction and an instruction that a defendant has a deep personal interest in the case.* A defendant has a deep personal interest in the outcome of a trial *whether or not he is guilty.* Thus, th[at] instruction, though

24

unnecessary and potentially prejudicial . . . is at least always true. *But a defendant does not always have a motive to testify falsely.* **An innocent defendant has a motive to testify truthfully.**

*Id*. (emphases added).

Accordingly, in *Gaines* we expressly "denounce[d] any instruction, . . . that tells a jury that a testifying defendant's interest in the outcome of the case creates a motive to testify falsely." *Id*. We concluded that

*in future cases, district courts should not instruct juries to the effect that a testifying defendant has a deep personal interest in the case.* Rather, a witness's interest in the outcome of the case ought to be addressed in the court's general charge concerning witness credibility. *If the defendant has testified, that charge can easily be modified to tell the jury to evaluate the defendant's testimony in the same way it judges the testimony of other witnesses.*

*Id*. at 249 (footnote omitted) (emphases added).

A year later, in *United States v. Brutus*, 505 F.3d 80 (2d Cir. 2007) ("*Brutus*"), we considered the following district court instructions:

"The defendant is on trial only for the crimes charged in the indictment and for nothing else. And although presumed innocent and because she is presumed innocent, a defendant is not obligated to testify on her own behalf. She is not obligated to call any witnesses or present any evidence on her own behalf. But a defendant may testify on her [own] behalf and this defendant did so.

25

"*A defendant* who does testify on her own behalf obviously *has a deep personal interest in the outcome of her prosecution*. It's fair to say that *the interest which a defendant has in the outcome of the case is an interest which is possessed by no other witness. And such an interest creates a motive to testify falsely.*

"And in appraising the credibility of a defendant who testified on her own behalf, you may take that into consideration. *However*, and I want to say that with as much force as I can muster, it by no means follows simply because a person has a vital interest in the outcome of her trial that she is not capable of telling a truthful and straightforward story. *The defendant's vital interest in the outcome of her case is not inconsistent with her ability to tell the truth.* It's for you to decide what extent[,] if at all, her interest in the outcome of this trial has affected the color of her testimony."

505 F.3d at 85 (emphases ours).

We noted that "[u]nder our system of criminal justice, it is 'axiomatic and elementary' that defendants are entitled to a presumption of innocence," *id*. (quoting *Coffin v. United States*, 156 U.S. 432, 453 (1895)), and that "'[t]o implement the presumption,' . . . 'courts must be alert to factors that may undermine the fairness of the fact-finding process,'" *Brutus*, 505 F.3d at 85 (quoting *Estelle v. Williams*, 425 U.S. 501, 503 (1976)). We observed that, accordingly, in *Gaines* "we established a prophylactic rule that *it is error to instruct* the jury *that a defendant's interest* in the outcome of the case *creates a motive to testify falsely*," *Brutus*, 505 F.3d at 87 (emphases

26

added), and we concluded that the charge in *Brutus* was error, especially given the reference to the defendant's "'deep personal interest,'" *id*.

Although the charge in *Brutus* was error, and the defendant's objection had been properly preserved, we concluded that the error was beyond a reasonable doubt harmless, given, *inter alia*, that it was "not a close case" and that the defendant's trial testimony was "manifestly incredible." *Id*. at 89.

In *United States v. Mazza*, 594 F. App'x 705 (2d Cir. 2014) ("*Mazza*"), we considered another jury instruction that was not meaningfully distinguishable from those found impermissible in *Gaines* and *Brutus*. The trial court instructed that

> "*Dominick Mazza, as a defendant in this case, is considered an interested witness. Such an interest in the outcome creates a motive to testify falsely* and may sway the witness to testify in a way that advances self-interests. Therefore, if you find that *any* witness whose testimony you are considering may have an interest in the outcome of this trial, then *you should bear that factor in mind when evaluating the credibility of the testimony and accept it with great care*."

*Id*. at 707-08 (emphases ours). We noted that to the extent that *Gaines* contained any ambiguities,

> in *Brutus*, we clarified that the impermissible instruction is not tempered when the court "omits additional language specifically cautioning the jury to carefully scrutinize and weigh the defendant's testimony," nor when the court includes "other, more

27

favorable language." 505 F.3d at 87. *The court's instruction violated our mandate issued five years prior and was clearly erroneous.*

*Mazza*, 594 F. App'x at 708 (emphasis added).

Although there had been no objection to the *Mazza* instruction in the district court, relegating the defendant to review only for plain error, we concluded that, as to two counts, that clearly erroneous instruction was prejudicial and warranted relief. For example, as to a count charging Mazza with having made a false statement, "[k]nowledge [wa]s an element of the offense charged," and it was "the only such element at issue," *id*. at 709. Mazza testified that he did not know the relevant fact, and on appeal "the government" pointed to "no evidence--and we f[ou]nd none--indicating or implying that Mazza had actual or constructive knowledge." *Id*. Thus, we concluded that "the false statement count hinge[d] heavily on Mazza's credibility, creating a reasonable probability that the erroneous instruction affected the outcome of the trial on that count." *Id*. Accordingly, as to that count and one other as to which the government faced a similar problem, we vacated the convictions.

Most recently, in *United States v. Mehta*, 919 F.3d 175 (2d Cir. 2019) ("*Mehta*"), the trial judge similarly instructed the jury in part that

28

"[y]ou may consider the fact that *a defendant's interest in the outcome* of the case *creates a motive for false testimony*, but it by no means follows that a defendant is not capable of telling the truth."

*Id*. at 180 (emphases ours). We noted that this charge, which "undermined the presumption of innocence, which is not only one of the most fundamental principles of our criminal justice system, but also one of the principles most widely known and understood by the public at large," *id*. at 183, was "directly contrary to the law of this Circuit," *id*. at 178. Discussing *Gaines* and *Brutus*, we stated,

> [w]e have repeatedly held, in no uncertain terms, that this charge is forbidden; district courts may not tell juries that a testifying defendant's personal interest in the outcome of a trial supplies a motive to lie.

*Mehta*, 919 F.3d at 182. We found that the error met the test for relief under plain-error analysis.

Finally, in *United States v. Munoz*, 765 F. App'x 547 (2d Cir. 2019) ("*Munoz*"), we considered the following slightly differently worded instruction:

> "In evaluating credibility of the witnesses, you should take into account any evidence that **any** witness who testified may benefit in some way from the outcome of the case. *Such an interest in the outcome creates a motive to testify falsely* and may sway a witness to testify in a way that advances his or her own interests." Trial Tr. 2290:14-19 . . . . "You should not disregard or disbelieve that testimony simply because a witness had or has such an interest, but if you accept it, you should do so with great care." Trial Tr.

29

2290:22-25. The district court further instructed that "Defendant Jose Munoz chose to testify in this case. You should examine or evaluate the his [sic] testimony *just as you would the testimony of any witness with an interest in the outcome of the case*." Trial Tr. 2294:7-10 (emphasis added).

*Munoz*, 765 F. App'x at 552 (first emphasis ours; other emphases in *Munoz*).

Although we were ultimately persuaded, in light of the government's overwhelming evidence, that the instruction did not affect the defendant's substantial rights, we concluded that the instruction was erroneous and was prohibited by our *Gaines-Brutus* line of cases:

> *The logical implication of the district court's instructions is that Munoz had a motive to testify falsely*: if "an interest in the outcome creates a motive to testify falsely," Trial Tr. 2290:16-17, and jurors should assess Munoz's testimony as a "witness with an interest in the outcome of the case," Trial Tr. 2294:8-10, then Munoz had an interest in the outcome of the case that created a motive to testify falsely. *Thus, the district court did indirectly what we said in* Brutus *and* Gaines *district courts cannot do directly: tell the jury that a criminal defendant who testifies has a motive to testify falsely.* While the district court did heed our admonition to discuss a "a witness's interest in the outcome of the case . . . in the court's general charge concerning witness credibility," *Gaines*, 457 F.3d at 249, *the instruction also skirted the spirit of* Brutus *and* Gaines.

*Munoz*, 765 F. App'x at 552 (emphases added).

C. *The Present Case*

We conclude that Solano satisfies the four-part *Olano* test for relief under plain-error analysis in this case. First, there was error. The above cases make it clear that the credibility charge given in the present case, which included the instruction (a) that a witness's interest "in the outcome of the case . . . . creates a motive on the part of the witness to testify falsely" (Tr. 673), and (b) that this applies to "any witness" (*id.*), suffers the same substantive constitutional defect identified and prohibited by *Gaines* and *Brutus* and their progeny. It is a matter of common sense that the defendant in a criminal case has a profound interest in its outcome, *see, e.g.*, *Gaines*, 457 F.3d at 244 ("a testifying defendant in a criminal trial has a personal interest in its outcome that is as deep as it is obvious"); an instruction indicating to the jury that that interest gives him a motive to testify falsely is contrary to the presumption of innocence.

Second, the error here is "plain." Even if the holdings in *Gaines*, *Brutus*, and *Mazza*--cases decided years prior to Solano's trial--had not sufficed to prohibit the precise linguistic formulation used here, which imputes a motive to testify falsely to "any" interested witness and thereby encompasses a testifying defendant, the language used by the trial court here is virtually identical to that found erroneous in

*Munoz.* Thus, the error in this linguistic formulation, if not plain at the time of Solano's trial, is surely plain now. The fact that *Munoz* was decided subsequent to the trial of Solano does not make the error less "plain," for "'it is enough that an error be "plain" at the time of appellate consideration' for '[t]he second part of the [four-part] *Olano* test [to be] satisfied.'" *Henderson v. United States*, 568 U.S. 266, 279 (2013) (quoting *Johnson*, 520 U.S. at 468).

Third, the instruction was prejudicial. The trial as to the charge that Solano attempted to possess cocaine with intent to distribute centered squarely on whether Solano knew, before picking up the Container at Red Hook on June 7, that the Container held drugs. As the government acknowledged in summation, after noting aspects of the case as to which there was no substantial disagreement, "[w]hat is in dispute is what the defendant knew." (Tr. 605.) And, as the government continued, finding the knowledge element would turn squarely on assessments of credibility because "[t]he defendant claimed that he didn't know the container he moved had ever had drugs in it." The government argued, "that's just not believable." (*Id.*)

This was indeed a credibility case, both as to what Solano knew--for, as described in Part I.A.2.e. above, Solano testified that he did not know the Container

32

had contained drugs--and, equally importantly, as to what he told the HSI task force members as to the state of his knowledge, because the only direct evidence that he had knowledge that the Container contained drugs came from the officer witnesses' testimony that Solano expressly admitted to them that he had had that knowledge. Solano testified that he never made any such statements.

Although the government argues that the testimony by the officer witnesses that Solano admitted knowledge finds support in records found on his cellphone and in inconsistencies in Solano's testimony as to, for example, when he made various statements in his June 7 conversations with Dalrymple, there is considerable circumstantial evidence in the record to support both Solano's testimony that he did not know the Container contained drugs and his testimony that he did not tell the officer witnesses that he did know.

Solano's testimony that when he picked up the Container he did not know that it held drugs was certainly plausible. He had been given the job of getting the Container only that morning, by Machuca, a man he had not worked for before; and he was to deliver it to an address provided by Machuca. He agreed to pick up the Container in part because he would earn the usual $600 for that job, and in part because the Container was at Red Hook and Solano had an empty container he

33

needed to return to Red Hook. Solano picked up the sealed Container and delivered it to the address provided by Machuca. After making the delivery, Solano simply departed.

Although Solano was advised by Montalvo that morning to be wary of Machuca, Solano and Montalvo testified, respectively, that Solano did not understand Montalvo to mean, and Montalvo did not in fact mean, that Machuca was involved in drugs.

Machuca was one of the men at the delivery destination to receive the Container in this HSI-controlled delivery. He testified at trial that he did not know the Container had held drugs; and the government has pointed to no evidence that Machuca was in fact involved with the drugs. Indeed, following the controlled delivery on June 7, Machuca had been questioned by HSI and released. As Solano's only contact with the Container was initiated by Machuca, and there was no evidence that Machuca knew of the drugs, there was no evidence in these events to show that Solano had such knowledge.

Further, although the government argued that Solano's contacts with Dalrymple were indicative of his knowledge, they surely need not have been so interpreted. Solano testified that when he arrived at the Red Hook Terminal to get

34

the Container, he noticed a car that looked as if it might be a law enforcement surveillance vehicle. That he might make such an observation was hardly implausible. Barrois testified that in preparation for the controlled delivery, seven or eight members of the HSI task force were parked in and around the Terminal--in cars that, in his experience, "previously [had] been recognized as law enforcement cars." (Tr. 103.) Nor was it implausible that Solano would wish to have reassurance that such surveillance did not relate to the job he had just been given by someone with whom he had no prior relationship; as described in Part I.A.1. above, Solano had twice (in his 20 years of trucking thousands of cargoes) been questioned about drug cargoes that he had transported unknowingly. Solano testified that on June 7, having noticed possible law enforcement surveillance, he thus called Dalrymple, the HSI officer with whom he had cooperated in 2014 and whose phone number he had been given, seeking reassurance and giving Dalrymple the identification number of the Container Machuca had asked him to pick up. And once on the road with the Container, Solano texted Dalrymple the delivery address and the contact information for Machuca. Solano's initiation of contact with, and furnishing of, *inter alia*, container identification and destination information to, a law enforcement agent whose known job focus was drug trafficking could easily be viewed by a jury as more consistent

35

with Solano's professed innocent concerns than with his knowing he was about to drive away with drugs.

As to the officer witnesses' testimony that Solano, in interview # 2 on June 7, admitted that he knew before he picked up the Container that it contained drugs, Solano testified that he had made no such admissions. The plausibility of that denial too is supported by circumstantial evidence. Although, as described in Parts I.A.2.a., b., c., and d. above, the officer witnesses testified that Solano expressly admitted that he had known before leaving with the Container that it contained drugs, they made no attempt to record those admissions.

Supervising Special Agent Etienne, who attended the first phase of interview # 2 and testified that Solano made those admissions of knowledge, could have made notes of such admissions. He did not.

Etienne testified that he immediately brought Barrois into the interview room, "recapped" Solano's admissions, and instructed that Solano repeat the admissions for Barrois. Etienne testified that he did so expressly for the purpose of "mak[ing] sure everything [wa]s documented properly." (Tr. 366.) Barrois testified that Solano did then admit, in his presence, knowing the Container contained drugs. But despite Etienne's testimony that he told his agents to make sure there was proper

36

documentation, there was none. Barrois admitted that he could have recorded Solano's admissions by using his cellphone. He chose not to. Barrois had made notes of Solano's first--concededly innocuous-- interview, and he could have made written notes of what he testified were, in the second interview, Solano's self-incriminating admissions of knowledge. Barrois made no such notes. Or the officers could have asked Solano to make any admissions in writing. They chose not to.

Apparently, the only officer witness who took any notes in interview # 2--the only interview in which it is claimed that Solano made any admissions of knowledge--was Corvi. Corvi, present throughout interview # 2, (a) apparently heard whatever admissions Solano made to Etienne, (b) apparently heard Etienne "recap[]" the Solano admissions Etienne described at trial and instruct that they be documented, and (c) apparently heard whatever admissions Solano then made to Barrois. But Corvi's notes say nothing whatsoever to indicate that Solano ever admitted knowing that drugs were in the Container.

Given the serious issues concerning the credibility of Solano's denial that he had known there were drugs in the Container and the credibility of his denial that he ever said that he did have that knowledge, as against the credibility of the officer witnesses' undocumented testimony that Solano admitted such knowledge, we

37

conclude that there is a reasonable probability that the motive-to-testify-falsely error prejudicially affected Solano's substantial rights.

Finally, it is not lost on us that the government, in its rebuttal summation on the question of whether *Miranda* warnings had been given, posed a hypothetical that could easily be seen as having disturbing applicability to the question of whether Solano told the officers that he had known the Container held drugs. Addressing the conflict between the officers' testimony that Solano had been given *Miranda* warnings on June 7 and had waived his *Miranda* rights in writing, and Solano's testimony that he in fact was not given *Miranda* warnings and the fact that the government was unable to produce any such written waiver, the government argued that "*if* the[ officer witnesses] *had been trying to make up a story, they would simply have said they had given him . . . oral*" *Miranda* warnings (Tr. 655 (emphases added)). On the issue of knowledge, the officer witnesses testified that Solano admitted to them that he had known the Container contained drugs; they testified that this was an important piece of information in a drug investigation; they testified that they could have recorded such an admission on a cellphone that was available, or that they could have asked Solano to make the admission in writing. They did neither. Instead, they simply said that his admissions were oral.

Given the serious credibility questions posed in this case, we conclude that the error in the district court's instruction, eroding the presumption of innocence to which Solano was entitled, seriously affects the fairness, integrity, or public reputation of judicial proceedings.  We accordingly vacate his conviction.

## CONCLUSION

We have considered all of the government's arguments in support of affirmance and have found them unpersuasive.  The judgment of conviction is vacated, and the matter is remanded to the district court for further proceedings not inconsistent with this opinion.